John T. Viars v Greenbrier Minerals, LLC, et al   CA 5:15-cv-15410 on July 25, 2016

— Sheet 1   Page 1 —

IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA
BECKLEY DIVISION


JOHN T. VIARS,

                    Plaintiff,

v.                              Civil Action No. 5:15-cv-15410
                                Honorable Irene C. Berger


GREENBRIER MINERALS, LLC,
and NATHAN BRADA

                    Defendants.



            The deposition of JOHN TOTTEN VIARS was taken
pursuant to the Federal Rules of Civil Procedure in the
above-entitled action, on the 25th day of July, 2016,
commencing at 1:00 p.m. and concluding at 4:45 p.m., at the
law offices of Dinsmore & Shohl, LLP, 707 Virginia Street,
13th Floor, Charleston, Kanawha County, West Virginia,
before Nancy McNealy, Certified Verbatim Reporter-Master,
duly certified by the West Virginia Supreme Court of
Appeals and the National Verbatim Reporters Association and
Notary Public of West Virginia, pursuant to notice.

— Page 2 —

APPEARANCES:           ON BEHALF OF THE PLAINTIFF:

            RICHARD W. WALTERS, Attorney at Law
            Shaffer & Shaffer, PLLC
            Post Office Box 3973
            Charleston, West Virginia 25339-3973


            ON BEHALF OF THE DEFENDANT:


            WILLIAM E. ROBINSON, Attorney at Law
            Dinsmore & Shohl LLP
            Post Office Box 11887
            Charleston, West Virginia  25339-1887

— Page 3 —

I N D E X

Witness:                    Examination

John Totten Viars            4 (Robinson)
                           176 (Walters)


Exhibits:                        Marked


No. 1, Application for Employment          52
No. 2, New Employment/Change of Status     58
No. 3, Position/Pay Changes                58
No. 4, Complaint                           64
No. 5, Disciplinary Action Form            66
No. 6, Disciplinary Action Form            70
No. 7, Disciplinary Action Form            73
No. 8, Letter dated 12-31-14               76
No. 9, Disciplinary Action Form            86
No. 10, Attendance Chart                   99
No. 11, Work Release Form                 111
No. 12, Disciplinary Action Form          129
       Form


Signature Page............................ Page 178
Errata Sheet.............................. Page 179
Reporter's Certificate.................... Pages 180/181

— Page 4 —

 1                    (Witness Sworn.)
 2    THEREUPON came,
 3            J O H N   T.   V I A R S
 4    the Plaintiff herein, having been first duly sworn, testified
 5    as follows:
 6                    EXAMINATION
 7            BY MR. ROBINSON:
 8            Q    Mr. Viars, again my name is Bill Robinson.  I
 9    represent Greenbrier Minerals in connection with this lawsuit.
10    Have you ever given a deposition before?
11            A    Yes.
12            Q    You have.  Okay, so you know basically what
13    we're going to do.
14            A    Yes.
15            Q    You understand you're under oath?
16            A    Yes.
17            Q    I'll be asking question.  You'll be answering
18    them truthfully.
19            A    Yes.
20            Q    You've been taught to say yes or no if that's
21    the correct answer, right?
22            A    (Witness nods affirmatively.)
23            Q    It's not a marathon.  I think we'll be out of
24    here before 5:00, but if at anytime you want to take a break



EXHIBIT
A

Blumberg No. 5118

John T. Viars v Greenbrier Minerals, LLC, et al   CA 5:15-cv-15410 on July 25, 2016

**Sheet 13   Page 49**

```
1          A    Not the specific date, no.
2          Q    Close?
3          A    It was in June.
4          Q    All right.  You came back from Greenville
5  sometime in May.  How long were you out of work between coming
6  back from Greenville and when you started at the State Park?
7          A    That time to around about the last part of
8  June.
9          Q    So about a month?
10         A    Yes.
11         Q    And you're currently making $8.75 an hour at
12 the park?
13         A    Yes.
14         Q    32 hours a week?
15         A    Yes.
16         Q    No benefits?
17         A    No.
18         Q    Is that a temporary job or is that a job that
19 you'll remain on into the fall, the winter, next spring?
20         A    As of right now, it's temporary but it could
21 become permanent.
22         Q    So whoever does the landscaping in the summer
23 moves on to other jobs during the other seasons of the year?
24         A    Not always.
```

**Page 50**

```
1          Q    Not always.  Have you had communications with
2  anybody about when your job might end?
3          A    Yes.
4          Q    Who and what did he tell you?
5          A    Should be at least to the end of the year.
6          Q    Through December?
7          A    Yes.
8          Q    And who told you that?
9          A    My supervisor.
10         Q    What's his name?
11         A    Chris Marcum.
12         Q    Do you know Mr. Marcum's title?
13         A    Maintenance supervisor.
14         Q    I don't want to put words in your mouth, but
15 do I understand he told you there might be a chance you'll
16 stay on into 2017?
17         A    Could be.
18         Q    Have you talked to him about whether there are
19 opportunities for you to receive an increase in your hourly
20 rate?
21         A    Yes.
22         Q    What's he told you told you about that?
23         A    No opportunity.
24         Q    For the foreseeable future at least?
```

**Page 51**

```
1          A    Yes.
2          Q    Have you talked to him about the chance that
3  you might qualify for employee benefits at some point?
4          A    Excuse me.
5          Q    Have you talked to him about whether you might
6  receive an employee benefits package at some point?
7          A    Yes.
8          Q    And what has he told you about that?
9          A    Have to be hired on as full-time.
10         Q    And because you work 32 hours a week, you're
11 considered part-time?
12         A    Yes.
13         Q    All right.  And the next logical question
14 then, have you talked to him about the chances you might go
15 from part-time to full-time?
16         A    Yes.
17         Q    What has Mr. Marcum told you about that?
18         A    It depends on the state's cutbacks.
19         Q    So you're caught up in the state budget mess?
20         A    Yes.
21         Q    It's my understanding that you were first
22 employed by Cliffs Logan County Coal, LLC in May 2011; is that
23 right?
24         A    Yes.
```

**Page 52**

```
1               (WHEREUPON, the Application for
2               Employment was marked as Deposition
3               Exhibit No. 1 for identification and
4               a copy attached hereto and made a
5               part hereof.)
6          BY MR. ROBINSON:
7          Q    The court reporter has handed you what we've
8  marked as Deposition Exhibit No. 1, which is a copy of your
9  employment application from Cliffs.  Do you recognize that,
10 sir?
11         A    Yes, sir.
12         Q    Is that your signature on page 2 of that
13 document?
14         A    Yes, sir.
15         Q    Okay.  According to this application, you
16 submitted it on May 11, 2011.  Do you see that beside your
17 signature on page 2?
18         A    Yes, sir.
19         Q    And you applied for a position as a shuttle
20 car operator?
21         A    Yes, sir.
22         Q    Do you remember who you submitted your
23 application to?
24         A    Jack Pauley.
```

John T. Viars v Greenbrier Minerals, LLC, et al  CA 5:15-cv-15410 on July 25, 2016

**Sheet 14   Page 53**

1      Q      And Jack Pauley was in human resources there
2  at the mine?
3      A      Yes, sir.
4      Q      After applying, were you interviewed for the
5  position?
6      A      Yes, sir.
7      Q      If you turn to page 3 of that document, you
8  will see an interview record and it's beyond my skills to make
9  out the signature at the bottom.  Do you remember who you
10 interviewed with?
11     A      Not that person.
12     Q      Okay, who did you interview with?
13     A      Jack Pauley.
14     Q      Anyone from management who you interviewed
15 with other than Mr. Pauley?
16     A      Not to my recollection.
17     Q      And were you interviewed in person or by
18 telephone?
19     A      In person.
20     Q      What do you recall of that interview?
21     A      Mr. Pauley asked me how much experience I had
22 and where I worked at.
23     Q      About how long did that interview last?
24     A      Just minutes.

**Page 54**

1      Q      Minutes.
2      A      It wasn't very long.
3      Q      Do you recall how long after you submitted the
4  application you received the interview?
5      A      Maybe a day or two.
6      Q      After you interviewed with Mr. Pauley, you had
7  no further interviews?
8      A      No.
9      Q      Obviously, the interview went well and you
10 were hired?
11     A      Yes.
12     Q      And you were hired, as I understand it, on May
13 23, 2011; does that sound right?
14     A      Yes, pretty close.
15     Q      You were indeed hired into the position as a
16 shuttle car operator?
17     A      Yes, sir.
18     Q      Have you ever seen this document before?
19     A      No.
20     Q      Okay.  You'll see at the top, it's called a
21 New Employment or Change of Status form, and it shows near the
22 top says if new employee, date employed 5-23-11.  Do you have
23 any reason to question that's the date you began work there?
24     A      What was the date again?

**Page 55**

1      Q      May 23, 2011.
2      A      Yes.
3      Q      You believe that's correct?
4      A      Yes.
5      Q      All right.  And it says then department
6  Chilton.  Is that a reference to the Chilton Mine?
7      A      Yes.
8      Q      Or also called the Chilton Dingess Mine?
9      A      Yes.
10     Q      Is that where you started your work with
11 Cliffs?
12     A      Yes.
13     Q      As a shuttle car operator?
14     A      Yes.
15     Q      You started there full time?    .
16     A      Yes.
17     Q      And according to this form, you started out at
18 $27.75 an hour; is that right?
19     A      Yes.
20     Q      Who was your supervisor while you were working
21 at the Chilton Mine?
22     A      Sears Miller.
23     Q      Pardon me?
24     A      Yeah, he was the mine foreman.

**Page 56**

1      Q      Was he your direct report?
2      A      No.
3      Q      Who did you report to directly?
4      A      Section boss.
5      Q      Who was that?
6      A      I can't recall his name.
7      Q      Did you have one section foreman the entire
8  time that you were at the Chilton Mine -
9      A      No.
10     Q      - or did you have several?
11     A      There was a few.
12     Q      Do you remember who any of them were?
13     A      Jerry Vance was one of them.
14     Q      Do you remember any of the others?
15     A      Like I say, I got faces.  It's been a while.
16     Q      All right.  I won't ask you to draw me a
17 picture.  Was your employment at that mine union or nonunion?
18     A      Nonunion.
19     Q      Let me ask you to go back for a minute to
20 Exhibit 1, the employment application, and turn to page 2.
21 You'll see in the last paragraph on page 2 -- let's take a
22 quick break while I go get my glasses.  I forgot them.
23            (WHEREUPON, a recess was taken,
24            after which the proceedings

John T. Viars v Greenbrier Minerals, LLC, et al   CA 5:15-cv-15410 on July 25, 2016

Sheet 15   Page 57

| | | |
|---|---|---|
| 1 | | continued as follows:) |
| 2 | | BY MR. ROBINSON: |
| 3 | Q | Mr. Viars, if you look at the bottom of page 2 |
| 4 | right above your signature is a paragraph and in case you |
| 5 | can't read it with the glasses you've been loaned, it says, |
| 6 | "I understand that if I am hired, both the company and I have |
| 7 | the right to terminate the employment relationship at any time |
| 8 | and for any lawful reason, with or without cause.  I further |
| 9 | understand that, although over the course of my employment |
| 10 | other terms and conditions of my employment may change, the |
| 11 | term of my employment will not change.  I understand that no |
| 12 | one other than the President of Cliffs Logan County Coal, LLC, |
| 13 | is empowered to make any representation to me or enter into |
| 14 | any agreement contrary to at will employment, and any contrary |
| 15 | agreement must be in writing and signed by the President." |
| 16 | Did you sign that language or read that |
| 17 | language before you signed the application? |
| 18 | A | Yes. |
| 19 | Q | Did you understand that if you were hired by |
| 20 | Cliffs, you would be an at will employee? |
| 21 | A | Yes. |
| 22 | Q | Did you remain a nonunion employee the entire |
| 23 | time you were employed by Cliffs from 2011 through 2014? |
| 24 | A | Yes. |

Page 58

| | | |
|---|---|---|
| 1 | Q | Well, how long were you at the Chilton Mine? |
| 2 | A | A couple years. |
| 3 | Q | And after working at the Chilton Mine for a |
| 4 | while, did you transfer to the Lower War Eagle Mine? |
| 5 | A | Yes, sir. |
| 6 | Q | You were remained a Cliffs Logan County Coal, |
| 7 | LLC employee when you moved to Lower War Eagle? |
| 8 | A | Yes. |
| 9 | | (WHEREUPON, the New Employment or |
| 10 | | Change of Status form was marked as |
| 11 | | Deposition Exhibit No. 2 and the |
| 12 | | Position/Pay Changes form was marked |
| 13 | | as Deposition Exhibit No. 3 for |
| 14 | | identification and copies attached |
| 15 | | hereto and made a part hereof.) |
| 16 | | BY MR. ROBINSON: |
| 17 | Q | The court reporter has handed you what we've |
| 18 | marked as Deposition Exhibit No. 3.  Have you ever seen that |
| 19 | document before? |
| 20 | A | No, sir. |
| 21 | Q | All right.  This document appears to show that |
| 22 | you were moved from Chilton to the Lower War Eagle Mine |
| 23 | effective August 5, 2012; does that sound correct? |
| 24 | A | Yes. |

Page 59

| | | |
|---|---|---|
| 1 | Q | Were there any problems or issues at the |
| 2 | Chilton Mine that caused you to move away to Lower War Eagle? |
| 3 | A | No. |
| 4 | Q | What were the circumstances behind your move |
| 5 | from Chilton to the Lower War Eagle Mine? |
| 6 | A | Chilton was worked out. |
| 7 | Q | Was it being shut down? |
| 8 | A | Yes. |
| 9 | Q | Do you recall how many employees were there at |
| 10 | the time that it was shut down? |
| 11 | A | Not specifically. |
| 12 | Q | Were most or all of those employees moved to |
| 13 | other Cliffs mines? |
| 14 | A | Yes. |
| 15 | Q | Or at least offered the opportunity to make |
| 16 | the move? |
| 17 | A | Yes. |
| 18 | Q | And, obviously, you accepted that opportunity? |
| 19 | A | Yes. |
| 20 | Q | When you moved to the Lower War Eagle Mine, |
| 21 | did you remain in the position of shuttle car operator? |
| 22 | A | Yes. |
| 23 | Q | Did you perform at Lower War Eagle the same |
| 24 | duties you had performed as a shuttle car operator at the |

Page 60

| | | |
|---|---|---|
| 1 | Chilton Mine? |
| 2 | A | Yes. |
| 3 | Q | Did your pay change in any time? |
| 4 | A | No. |
| 5 | Q | You remained at $27.75 an hour? |
| 6 | A | Best of my knowledge. |
| 7 | Q | During the time you worked at Lower War Eagle |
| 8 | as a shuttle car operator, was your direct supervisor a |
| 9 | section foreman? |
| 10 | A | Yes. |
| 11 | Q | Over time did you have more than one section |
| 12 | foreman? |
| 13 | A | Yes. |
| 14 | Q | Do you recall who your various section foremen |
| 15 | were at Lower War Eagle? |
| 16 | A | One was Danny.  I can't remember his last |
| 17 | name. |
| 18 | Q | Danny Osborne? |
| 19 | A | Yes.  I think T. J. Miller, if that was his |
| 20 | name, it was T. J.  That's about all I can remember. |
| 21 | Q | Was Chester Bradsher one of them? |
| 22 | A | No, I never worked for Chester. |
| 23 | Q | You never worked for Chester? |
| 24 | A | Just him filling in is all. |

John T. Viars v Greenbrier Minerals, LLC, et al   CA 5:15-cv-15410 on July 25, 2016

Sheet 16   Page 61

```
 1    Q    So all you remember at this point is Danny and
 2  T. J.?
 3    A    I stand to be corrected, sir.  I did work for
 4  Chester for a brief time.
 5    Q    So Chester, Danny and T. J. are the three that
 6  you can remember?
 7    A    Yes.
 8    Q    Did you have a good relationship with all of
 9  them?
10    A    For the most part.
11    Q    Did you feel that all three of those guys
12  treated you fairly?
13    A    No.
14    Q    Who did you feel didn't treat you fairly?
15    A    T. J.
16    Q    Why did you feel T. J. didn't treat you
17  fairly?
18    A    It seemed like the harder I worked, the more
19  he stayed on me.
20    Q    Do you recall approximately what period of
21  time you worked for T. J.?
22    A    The last part of employment.
23    Q    And when you say the harder you worked, the
24  harder he stayed on you, can you give me some examples?
```

Page 62

```
 1    A    I just couldn't do nothing right according to
 2  him.  No matter what you did, it was always wrong.
 3    Q    You ever have any arguments with him?
 4    A    No.
 5    Q    You guys didn't raise your voices with each
 6  other, that kind of thing?
 7    A    I didn't.
 8    Q    Okay.  Did he raise his voice with you?
 9    A    Yes.
10    Q    That's because he felt you weren't doing a
11  good job?
12    A    I suppose.
13    Q    Was T. J. your section foreman at the time of
14  your discharge?
15    A    Yes.
16    Q    And as of that time in June 2014,
17  approximately how long had you been working with him?
18    A    Not very long at all.
19    Q    A matter of weeks?
20    A    Maybe a month or so.
21    Q    All right.  Now Danny and Chester, did you
22  have good relationships with them?
23    A    No problem.
24    Q    You felt they treated you fairly?
```

Page 63

```
 1    A    Yes.
 2    Q    You allege in this case that by terminating
 3  your employment in June of 2015, Greenbrier Minerals
 4  interfered with your rights under the Family and Medical Leave
 5  Act.  Are you familiar with that allegation?
 6    A    Yes.
 7    Q    And are you also familiar with the allegation
 8  that by terminating your employment in June 2015, Greenbrier
 9  Minerals retaliated against you for exercising your rights
10  under the FMLA?  Do you understand that allegation has been
11  made as well?
12    A    Ask the question again, please.
13    Q    Do you understand that you assert in this case
14  that by discharging you in June 2015, Greenbrier Minerals
15  retaliated against you for exercising your rights under the
16  FMLA?
17    A    I was never offered FMLA.
18    Q    Do you understand you're alleging retaliation
19  for using FMLA?
20    A    I never used FMLA.
21    Q    You're not aware of a retaliation allegation
22  in this case; is that fair?
23    A    Yes.
24              (WHEREUPON, the Complaint was marked
```

Page 64

```
 1              as Deposition Exhibit No. 4 for
 2              identification and a copy attached
 3              hereto and made a part hereof.)
 4    BY MR. ROBINSON:
 5    Q    Let me ask you, Mr. Viars, to please turn to
 6  page 2 of what we've marked as Deposition Exhibit 5, but
 7  before we go there.
 8    MR. WALTERS:    It's 4.
 9    BY MR. ROBINSON:
10    Q    Thanks.  I correct that to Exhibit 4.  Do you
11  recognize the document we've marked as Exhibit 4?
12    A    Yes.
13    Q    It's a copy of the complaint that you filed in
14  this lawsuit; is that right?
15    A    Yes.
16    Q    Did you read this before it was filed?
17    A    Yes.
18    Q    Let me ask you to turn please to paragraph 8
19  on page 2 of this exhibit?
20    A    (Witness complies.)
21    Q    Paragraph 8 rather alleges, "On or about April
22  27, 2015, plaintiff's mother underwent open-heart surgery.
23  Following her surgery, plaintiff took a one week's vacation to
24  provide support and care for his mother."  You're familiar
```

John T. Viars v Greenbrier Minerals, LLC, et al  CA 5:15-cv-15410 on July 25, 2016

Sheet 17  Page 65

```
 1  with that allegation?
 2       A    Yes.
 3       Q    Do you believe that to be correct?
 4       A    Yes.
 5       Q    All right.  Then paragraph 9 reads, "On or
 6  about June 1, 2015, plaintiff's mother's condition worsened
 7  and she was moved from a nursing home to the hospital.
 8  Plaintiff Viars is the medical power of attorney for his
 9  mother and as such took the day off to care for his mother."
10  Are you familiar with that allegation?
11       A    Yes.
12       Q    And do you believe that to be accurate?
13       A    Yes.
14       Q    Am I correct that the only FMLA leave time at
15  issue in this case took place in April 2015 when you took five
16  days of vacation time for your mother's surgery and a single
17  day in June 2015 when your mother was moved to the hospital?
18       A    Yes.
19       Q    You did not take off any other FMLA covered
20  time before your discharge in June 2015?
21       A    No.
22       Q    Do you recall that right within a month or so
23  after you transferred to Lower War Eagle you were written up
24  for causing equipment damage?
```

Page 66

```
 1       A    Excuse me.
 2       Q    Do you remember that shortly after being
 3  transferred to the Lower War Eagle Mine you were written up
 4  for causing equipment damage.
 5       A    Shortly after?
 6       Q    Yes, sir.
 7       A    No, sir.  I don't know what time frame we're
 8  talking here.
 9       Q    We talked about a moment ago about you were
10  transferred to Lower War Eagle Mine effective August 5, 2012,
11  correct?
12       A    Yes.
13                    (WHEREUPON, the Disciplinary Form
14                    was marked as Deposition Exhibit No.
15                    5 for identification and a copy of
16                    which is attached hereto and made a
17                    part hereof.)
18  BY MR. ROBINSON:
19       Q    All right.  Then let me ask you to look at
20  what we've marked as Deposition Exhibit No. 5, which is dated
21  August 31, 2012.  Have you seen this document before?
22       A    No, sir.
23       Q    This is a document that appears to have been
24  prepared by Danny Osborne, and I apologize for the quality of
```

Page 67

```
 1  the copy but the first language at the top says, "What was the
 2  cause of the failure," and he circles item C, "Equipment
 3  damage."  Do you recall an incident on or about August 31,
 4  2012, relating to an instance of equipment damage?
 5       A    I don't remember.
 6       Q    If you look down at item number 6, it asks the
 7  question, "What can be done to prevent this from happening
 8  again," and Mr. Osborne answers "That the shuttle car operator
 9  needs to pay more attention to and where the tight spots are
10  and to take more time to properly put cable out of his
11  roadway."  Do you recall if Mr. Osborne talked to you about
12  that in August 2012?
13       A    I don't remember it.
14       Q    Do you remember this incident at all?
15       A    Not when my canopy caught a cable, no.
16       Q    And it says in item 7, "Give a description of
17  what happened to cause cable damage," and Mr. Osborne wrote,
18  "Shuttle car was coming back to the dump when his canopy
19  caught cable against rib."  Does that help you remember at
20  all?
21       A    I can't recall this.
22       Q    Okay.  Mr. Osborne then writes, "I talked to
23  the shuttle car operator, told him to be more aware of where
24  and how the miner cable is running and hanging, take more time
```

Page 68

```
 1  to ensure it's out of his roadway."  Do you recall him talking
 2  to you about that?
 3       A    Now that it mentions the miner cable, I recall
 4  the incident.
 5       Q    Okay.  And do you recall that in this incident
 6  on or about August 31, 2012, the cable was damaged when you
 7  ran over it?
 8       A    Didn't run over it, sir.  It was on the rib
 9  when my canopy caught it.  I do remember what he's talking
10  about.  I thought he was referring to the shuttle car cable
11  itself.
12       Q    What is your understanding or memory of what
13  occurred that day?
14       A    My understanding is you could only get it up
15  so high, and it was a real tight place.  The canopy stuck out
16  and when I turned the corner, I had been turning it all day
17  and staying off of it, but the one time got in there and got a
18  little close to the rib and my canopy cut it and cut the miner
19  cable.
20       Q    Okay.  So this incident was written up on
21  August 31, 2012, did in fact occur?
22       A    Yes, it did, but I've never seen this paper
23  before in my life.
24       Q    Do you recall Mr. Osborne talking to you about
```

John T. Viars v Greenbrier Minerals, LLC, et al  CA 5:15-cv-15410 on July 25, 2016

Sheet 18  Page 69

```
 1  this incident in August 2012?
 2        A.    No.
 3        Q.    Did you understand at that time that Mr.
 4  Osborne felt that you needed to be more aware when performing
 5  your duties as a shuttle car operator?
 6        A.    He never said a word to me.
 7        Q.    Did you -- in view of what happened that you
 8  cut the miner cable, did you feel you needed to be more aware
 9  when performing your duties as a shuttle car operator?
10        A.    I felt that they needed -- they needed to pay
11  more attention to how they were setting these sections up.
12        Q.    So you saw this as the company's fault not
13  your fault?
14        A.    Yes.
15        Q.    Do you recall if anyone other than Mr. Osborne
16  talk to you about this incident in or about August 2012?
17        A.    Say again, please.
18        Q.    Yeah.  Do you remember if anybody else in
19  company management talked to you about this incident?
20        A.    No, no one.
21        Q.    And approximately what time of day, if you
22  remember, did that occur?
23        A.    I can't remember at all.
24        Q.    But you said all day long you had been getting
```

Page 70

```
 1  through that tight spot without hitting the cable and damaging
 2  it?
 3        A.    Yes, but it shouldn't have even been an issue.
 4        Q.    Do you recall if you had any disciplinary
 5  writeups prior to August 31, 2012?
 6        A.    I don't remember.
 7        Q.    You don't remember if you had any from the
 8  Chilton Mine?
 9        A.    I don't remember.
10        Q.    And this incident on August 31, 2012 occurred
11  long before, three years before, you ever took any FMLA leave,
12  correct?
13        A.    Yes.
14        Q.    Do you recall that well over a year later you
15  were disciplined for damaging miner cable?
16        A.    Over a year?
17        Q.    About a year after that incident.  In December
18  of 2013 do you recall being disciplined for damaging a miner
19  cable?
20        A.    I don't remember.  I'd have to see.
21              (WHEREUPON, the Disciplinary Action
22              Form was marked as Deposition
23              Exhibit No. 6 for identification and
24              a copy attached hereto and made a
```

Page 71

```
 1              part hereof.
 2              BY MR. ROBINSON:
 3        Q.    The court reporter has handed you what we've
 4  marked as Deposition Exhibit No. 6, which is a disciplinary
 5  action form with a date of warning of December 30, 2013.  Do
 6  you recognize this document?
 7        A.    Yes.
 8        Q.    And this is, in fact, what the company called
 9  a disciplinary action form?
10        A.    Yes.
11        Q.    According to this form, you received a written
12  warning on December 30, 2013.  Do you recall that?
13        A.    Yes.
14        Q.    Is that your signature on the form?
15        A.    Yes, it is.
16        Q.    And the warning is also signed by Alex Stewart
17  and George Wheatley.
18        A.    Yes.
19        Q.    And Mr. Stewart and Mr. Wheatley were both
20  shift foremen at that time?
21        A.    Yes.
22        Q.    On the form you'll see about halfway down the
23  page, it says Reasons for Discipline and a box checked Overall
24  Performance.  Do you see that?
```

Page 72

```
 1        A.    Yes.
 2        Q.    And then in the brief explanation section, it
 3  said, "Pulled cable out between #1 and #2 entry.  This was the
 4  second time it had happened.  The cable was short.  Would not
 5  go to #1."  Do you see that?
 6        A.    I do.
 7        Q.    Is that an accurate description of what
 8  happened that day?
 9        A.    It's accurate.
10        Q.    Did you understand that company management
11  felt that disciplinary action against you was appropriate as a
12  result of that incident?
13        A.    Yes.
14        Q.    And did you understand that management felt
15  you had been careless in performing your duties as a shuttle
16  car operator in connection with an incident?
17        A.    Yes.
18        Q.    Did you agree with them?
19        A.    No.
20        Q.    Why not?
21        A.    Because the cable on this buggy, the guy on
22  the other shift cut it several times and I didn't know how
23  much was on it.  This incident here, if I'm remembering
24  correctly, it occurred early, and I should have checked the
```

John T. Viars v Greenbrier Minerals, LLC, et al  CA 5:15-cv-15410 on July 25, 2016

Sheet 19   Page 73

```
 1  cable, but I got in there running over to number one just
 2  where we started and didn't have enough cable to get to the
 3  miner because they had taken cable off of it without informing
 4  anybody.
 5           Q    And you were unaware that that condition
 6  existed until it broke?
 7           A    Yes.
 8           Q    Mr. Stewart or Mr. Wheatley, whoever prepared
 9  this form, says this was the second time it had happened.  Was
10  there a previous incident where the same thing had happened?
11           A    I pulled it out a couple of times.
12           Q    Did you understand that management was
13  displeased with your performance in connection with those
14  incidences?
15           A    Yes.
16           Q    And this particular disciplinary action
17  against you also predated your absences in April and June 2015
18  by a year and half or so?
19           A    Excuse me.
20           Q    This discipline was given to you about a year
21  and a half before you took any potentially FMLA covered leave;
22  is that right?
23           A    Yes.
24                (WHEREUPON, the Disciplinary Action
```

Page 74

```
 1                          Form was marked as Deposition
 2                          Exhibit No. 7 for identification and
 3                          a copy attached hereto and made a
 4                          part hereof.)
 5  BY MR. ROBINSON:
 6           Q    The court reporter has handed you what we've
 7  marked as Deposition Exhibit No. 7.  Do you recognize that
 8  document?
 9           A    I do.
10           Q    You've seen this before?
11           A    Not with the writing at the bottom.
12           Q    Is that not your writing?
13           A    At the bottom?
14           Q    Yes, sir.
15           A    No, sir.
16           Q    All right.  This is another disciplinary
17  action form, correct?
18           A    Yes.
19           Q    And it relates to a written warning you
20  received on August 25, 2014?
21           A    Yes.
22           Q    Do you recall -- well, this form appeared to
23  have been signed by Nathan Brada.  What was Mr. Brada's
24  position at the time?
```

Page 75

```
 1           A    Superintendent.
 2           Q    And you'll see Reasons for Discipline, he
 3  checks attendance, right?
 4           A    Yes.
 5           Q    Did you understand on August 25, 2014, that
 6  company management felt that disciplinary action was issued as
 7  a result of your attendance?
 8           A    Yes.
 9           Q    At this time rather than relating to overall
10  job performance, the only issue was your attendance record?
11           A    Yes.
12           Q    And this disciplinary action against you also
13  predated your absences in April and June 2015?
14           A    Not according to this.
15           Q    Well, date of warning 8-25-14, so that
16  would've been at least eight months before you ever took any
17  leave that you believe to be covered by the FMLA; is that
18  right?
19           A    Yes.
20           Q    Did you meet with anyone in connection with
21  this disciplinary action form?
22           A    Meet with anyone.
23           Q    Who gave it to you?
24           A    I can't remember.
```

Page 76

```
 1           Q    Do you remember if you met with Jack Pauley
 2  regarding this issue?
 3           A    I can't remember that either.
 4           Q    Do you remember who you received the December
 5  30, 2013, disciplinary action form from, Exhibit 6?
 6           A    Exhibit 6.
 7           Q    Yes.
 8           A    Yes, George Wheatley.
 9           Q    You met personally with Mr. Wheatley on that
10  one?
11           A    Yes.
12           Q    Was Mr. Pauley present for that meeting as
13  well?
14           A    Not that I recall.
15           Q    Do you recall if anyone from human resources
16  was present for that meeting?
17           A    No.
18                (WHEREUPON, the Letter dated
19                December 31, 2014, was marked as
20                Deposition Exhibit No. 8 for
21                identification and a copy attached
22                hereto and made a part hereof.)
23  BY MR. ROBINSON:
24           Q    The court reporter has handed you what we've
```

1 marked as Deposition Exhibit No. 8, which is a December 31,
2 2014, letter to you from Gary Groves.  Do you recognize this
3 document?
4          A    Yes, I do.
5          Q    This is an offer letter from Greenbrier
6 Minerals?
7          A    Yes.
8          Q    And it's my understanding that Greenbrier
9 Minerals, LLC purchased from Cliffs the Lower War Eagle Mine
10 and other properties in late December 2014.
11         A    Yes.
12         Q    And by this December 31, 2014, letter you were
13 offered employment with the Greenbrier Minerals, LLC, Buffalo
14 Energy Division?
15         A    Yes.
16         Q    You were offered the same position as a
17 shuttle car operator?
18         Q    At an hourly rate of $27.50 an hour?
19         A    Yes.
20         Q    The letter goes on to state that you were to
21 report to your normal location and shift.  Was that still the
22 Lower War Eagle Mine?
23         A    Yes.
24         Q    And you became a Greenbrier Minerals employee

1 on January 5, 2015?
2          A    Yes.
3          Q    Is that your signature at the bottom of the
4 letter?
5          A    Yes, it is.
6          Q    Is it fair to say you read the entirety of
7 this letter before you signed it?
8          A    Yes.
9          Q    Was there anything about that letter you
10 didn't understand?
11         A    No.
12         Q    If you look at the fifth paragraph down, it
13 says, "Your employment with Greenbrier Minerals, LLC, Buffalo
14 Energy Division is at will and either party can terminate
15 employment at any time without cause and with or without
16 notice."  From reading that letter, did you understand that as
17 stated you would be an at will employee with Greenbrier
18 Minerals?
19         A    Yes.
20         Q    Am I correct that everyone who was in
21 management at the Lower War Eagle Mine on December 31, 2014,
22 stayed in management with Greenbrier Minerals as of January 5?
23         A    Yes.
24         Q    Do you remember if there were any mine

1 management employees who were Cliffs' employees who
2 disappeared during that transition or did everybody make the
3 move over?
4          A    There was some safety people I believe that
5 were let go.  That's all I can remember.
6          Q    Did everyone in your management chain make the
7 transition from Cliffs to Greenbrier Minerals?
8          A    Yes.
9          Q    Did everyone on your crew make the transition?
10         A    To the best of my knowledge.
11         Q    And Jack Pauley, the human resource manager,
12 transitioned to Greenbrier Minerals?
13         A    Yes.
14         Q    Who was your direct supervisor when this
15 change was made in December 2014?
16         A    Earl Crone.
17         Q    And what was your position in December 2014?
18         A    I'm trying to remember, but I believe they had
19 me on the belts at that time.
20         Q    You had already moved to the belts from
21 shuttle car operator?
22         A    Yes.  I went back and forth.  It's hard to
23 remember.
24         Q    And Crone was the belts coordinator.

1          A    Yes.
2          Q    Did he remain your direct supervisor right
3 after the changes then to Greenbrier Minerals?
4          A    Yes.
5          Q    How did the change in position from shuttle
6 car operator to belts examiner/fire boss come about?
7          A    Well, they told me that they were shorthanded
8 on the belts and because I was certified that's where they
9 needed me.
10         Q    Do you know if it also had anything to do with
11 the fact that they weren't pleased with your performance as a
12 shuttle car operator?
13         A    I asked that question directly and I was told
14 no.
15         Q    By whom?
16         A    Nathan Brada.
17         Q    Do you know who in management was responsible
18 for the change in your position from shuttle operator to belt
19 examiner?
20         A    Nathan Brada ran the mines.
21         Q    And did this change occur sometime around
22 December 2014 right before the transition to Greenbrier
23 Minerals?
24         A    Excuse me now.

John T. Viars v Greenbrier Minerals, LLC, et al   CA 5:15-cv-15410 on July 25, 2016

Sheet 21   Page 81

```
1        Q       That's a bad question.  Did your change in
2  position from shuttle car operator to belt examiner take place
3  in or around December of 2014 right before the transition to
4  Greenbrier Minerals?
5        A       It was prior to the transition.
6        Q       Had you worked with Mr. Crone prior to
7  December 2014?
8        A       Yes.
9        Q       And let's talk about that very briefly.  You
10 said a couple minutes ago that you had been moved back and
11 forth a few times?
12       A       Yes, sir.
13       Q       What were the circumstances under which they
14 sometimes moved you over to the belt examiner position?
15       A       Each time I was just told that they were
16 shorthanded and they needed me on the belts, only explanation.
17       Q       What, were you doing vacation fill-ins and
18 things like that as a belt examiner?
19       A       No.
20       Q       What's the longest time prior to December 2014
21 when you went to that job full time, what's the longest period
22 you would serve as a belt examiner before going back to
23 shuttle car operator?
24       A       I recall at one point it was probably a year
```

Page 82

```
1  or better.
2        Q       Oh, really, okay.  And that was while it was
3  still Cliffs?
4        A       Yes.
5        Q       Okay.  Did you have a good relationship with
6  Mr. Kron?
7        A       Yes.
8        Q       Did you feel he treated you fairly?
9        A       At times.
10       Q       Are there instances in which you felt you were
11 treated unfairly by Mr. Kron?
12       A       Yes.
13       Q       Can you tell us what those were?
14       A       I can't remember specifically, but I know
15 there were several occasions where that he wasn't telling me
16 everything that was going on and I knew it.
17       Q       Can you elaborate?  I don't know what you
18 mean.
19       A       That's about the best I could do, just --
20 like, for instance, the reason I was on the belts, he knew
21 more than what he did, and he wouldn't tell me; and I know
22 there were times that I should have had help on some of the
23 tasks and didn't receive it.
24       Q       When you say he knew more about the reasons
```

Page 83

```
1  you were on the belts than he was telling, what was your
2  understanding of the reason you were on the belts?
3        A       Well, just what I just told you because they
4  needed people on the belts and they were shorthanded.
5        Q       And what is it you think he knew that he
6  wasn't telling you?
7        A       I have no clue.
8        Q       All right.  So you think he wasn't exchanging
9  some information with you that you thought he should, but you
10 can't sit here, sitting here today, tell us what that was?
11       A       I can't prove anything.
12       Q       All right.  Otherwise did Mr. Crone treat you
13 fairly throughout the time he supervised you?
14       A       Yes.
15       Q       And did Mr. Crone report directly to Mr.
16 Brada?
17       A       Yes.
18       Q       Now as a beltman at Lower War Eagle, you were
19 responsible for keeping the belts cleaned and shoveled?
20       A       Yes.
21       Q       You were responsible for the rock dusting?
22       A       Yes.
23       Q       You were responsible for properly maintaining
24 the belts?
```

Page 84

```
1        A       Yes.
2        Q       And as a fire boss, you had to be certified by
3  the state?
4        A       Yes.
5        Q       And your primary job, as we discussed earlier,
6  was to examine the belts for hazards before the next shift
7  came in?
8        A       Yes.
9        Q       At Lower War Eagle were you responsible for as
10 a fire boss for inspecting anything other than the belts?
11       A       No.
12       Q       Is it fair to say that in doing your
13 inspection you were trying to make sure that the belts were up
14 to state and federal safety standards?
15       A       Yes.
16       Q       And if you found a hazard while fire bossing,
17 you were to repair it or shut the area down?
18       A       If I would have shut them belts down, they
19 would have fired me.
20       Q       Did you ever shut a belt down?
21       A       Yes.
22       Q       And you weren't fired for it?
23       A       It wasn't for something that took a long time.
24       Q       When did you shut the belts down?
```

John T. Viars v Greenbrier Minerals, LLC, et al  CA 5:15-cv-15410 on July 25, 2016

Sheet 22  Page 85

```
1        A    Couple times to trim splices.  I can't specify
2   particular times.
3        Q    But it was well before your discharge in June
4   2015?
5        A    Yes.
6        Q    If you found a hazard while fire bossing, what
7   were you supposed to do about it?
8        A    You're suppose to correct it.
9        Q    And?
10       A    Report it in a book and you got so long to
11  correct it.
12       Q    And to correct it, you would call in whoever
13  was needed to make the repairs or otherwise fix the hazard?
14       A    Yes.
15       Q    If you found during your fire boss inspection
16  everything looked good, how would you report that information?
17       A    None observed.
18       Q    Did you keep a book?
19       A    Yes.
20       Q    Fire boss book?
21       A    Outside, yes.
22       Q    And when you found that everything was safe
23  for the next shift to come in, would you radio out to someone
24  and say everything is looking good?
```

Page 86

```
1        A    Yes.
2        Q    Who did you make that communication with?
3        A    I can't recall.
4        Q    Was it some -- you know, did they have a
5   dispatcher or lamp man who was responsible for that?
6        A    It would have been the person that fire bossed
7   the belts on the next shift and I don't remember who that was.
8        Q    So it would have been the next belt man coming
9   in?
10       A    Right.
11       MR. ROBINSON:  Do you want to take a break?
12       THE WITNESS:  Please.
13                       (WHEREUPON, a recess was taken,
14                       after which the proceedings
15                       continued as follows:
16                       (WHEREUPON, the Disciplinary Action
17                       Form was marked as Deposition
18                       Exhibit No. 9 for identification and
19                       a copy of which is attached hereto
20                       and made a part hereof.)
21       BY MR. ROBINSON:
22       Q    Mr. Viars, the court reporter has handed you
23  what we've marked as Deposition Exhibit No. 9.  Do you
24  recognize that document, sir?
```

Page 87

```
1        A    I do.
2        Q    This is another disciplinary action form
3   issued to you on April 7, 2015?
4        A    Yes.
5        Q    And this was issued a couple weeks before you
6   took vacation leave around the time of your mother's heart
7   surgery?
8        A    Yes.
9        Q    Is that your signature toward the bottom of
10  the document?
11       A    Yes.
12       Q    And Nathan Brada also signed it as the mine
13  manager?
14       A    Yes.
15       Q    And Jack Pauley signed it as the human
16  resources manager?
17       A    I see his signature, but I guess he signed it
18  after I see it.
19       Q    All right.  Yeah, and you see his signature is
20  dated April 14, 2015.  Yours is April 8, 2015.
21       A    Yes.
22       Q    Correct that this document depicts a warning
23  related to issues with your performance as a beltman/fire
24  boss?
```

Page 88

```
1        A    Yes.
2        Q    And the Reasons for Discipline, section 3,
3   different boxes are checked:  Quality of Work, Initiative and
4   Overall Performance.  Do you see that?
5        A    I do.
6        Q    And under the Brief Explanation section, it
7   says "Almost immediately after his fire boss run one of the
8   belts John is responsible for was examined by a federal
9   inspector.  The inspector wrote two violations concerning
10  things that should have been found and corrected during his
11  examination."  Do you recall that incident?
12       A    I do.
13       Q    It goes on to say, "It has been explained to
14  John that if he continues to make inadequate exams and doesn't
15  improve his work habits, further disciplinary action will be
16  taken."  Do you see that?
17       A    I do.
18       Q    And was it explained to you that if you
19  continue to make inadequate exams and didn't improve your work
20  habits, further disciplinary action would be taken?
21       A    It ain't the words he used.  They were a lot
22  harsher than that but yes.
23       Q    All right.  You saw these words on the form
24  when you signed it?
```

John T. Viars v Greenbrier Minerals, LLC, et al   CA 5:15-cv-15410 on July 25, 2016

Sheet 23   Page 89

```
1                A    I did.
2                Q    And what do you recall the harsh words being,
3  when you say he, referring to Mr. Brada?
4                A    Yes, sir.
5                Q    Do you mind repeating to me what you recall
6  him saying to you?
7                A    I don't use that type of language.
8                Q    Can you clean it up for us a little bit and
9  tell us roughly what you recall him saying to you?
10               A    The F bomb was dropped several times, maybe
11 even the Lord's name in vain.
12               Q    Did it relate to this particular incident that
13 occurred on April 7, 2015?
14               A    It did.
15               Q    Did it relate to what he viewed as problems
16 with the quality of your work, problems with your initiative
17 and problems with your overall job performance?
18               A    His problem was that he got written up.
19               Q    Well, let's talk about that.  Did the company,
20 in fact, receive two violations concerning issues with the
21 belts on that date?
22               A    They did.
23               Q    And did the federal inspector issue those
24 citations after you had conducted your examination of the
```

Page 90

```
1  belts?
2                A    No, sir.  I was in the process of making my
3  examination, and I ran into the inspector on my way.
4                Q    Tell me what occurred?
5                A    The whole situation, I just come off the buggy
6  again and was put on these belts, okay, and I might add that I
7  can't remember the guy's name.  I wish I could tell you.  The
8  section foreman that I worked for begged them not to take me
9  off because we were loading -- out loading in the main mine,
10 but they put me on these belts.  I'd never even been on them
11 before and hadn't been on the belts, just an estimate, I mean
12 I can't remember exactly how long it was.  I'm thinking it was
13 a week or maybe just a little more than that, and I had made a
14 vast improvement to what I found, and I had been reporting
15 these violations continuously and one of the violations that
16 the inspector wrote that I know of was stuck rollers and to
17 Mr. Crone, which was my supervisor, everyday I was writing
18 down what rollers were bad.  I could not change those rollers
19 and the belt running, and it's to my belief -- now I'm sure
20 they would say different -- but it's to my belief if I shut
21 the belt down for any extended period of time, I would have
22 paid for it.  Let's just put it like that.
23               Q    Why could you not shut it down to repair the
24 rollers?
```

Page 91

```
1                A    Because it would stop production.
2                Q    If you shut the belt down, could you have
3  repaired or replaced the rollers?
4                A    No, because I didn't have any on the section.
5                Q    If you had - when did you first see that
6  there was a problem with the rollers?
7                A    I had corrected several and had several
8  changed, but there were still several that needed changed, and
9  I had noticed this problem immediately after being assigned to
10 this beltline.
11               Q    And you were assigned to that beltline a week
12 or two before this notice, this disciplinary warning, was
13 issued?
14               A    In that neighborhood.
15               Q    And you had noticed the problem with the
16 rollers shortly after you started working on that belt?
17               A    Yes.
18               Q    And you had already repaired or replaced some
19 of the rollers but not all of them?
20               A    Yes.  What I had parts for.
21               Q    Did you ask that other parts be purchased?
22               A    Yes, I had reported it and then the third
23 shift was responsible for changing rollers, and the third
24 shift, I can't even -- the best of my remembrance, they never
```

Page 92

```
1  changed the first roller on that beltline.
2                Q    Who did you report - to whom did you report
3  that the rollers needed to be repaired or fixed?
4                A    Earl Crone.
5                Q    And who was responsible from the management
6  side for the third shift maintenance?
7                A    Would have been Earl Crone.
8                Q    Who ran the crews on third shift that would've
9  been the people to repair or replace the rollers?
10               A    Pete Stewart.
11               Q    Pete Stewart?
12               A    I don't think -- no, excuse me, Pete Sprouse.
13               Q    Pete Sprouse.  He was a maintenance foreman or
14 a section foreman?
15               A    He was the belt foreman.
16               Q    Was it Mr. Sprouse and his crew who did repair
17 or replace the rollers that already had been worked on?
18               A    They were responsible for it, yes.
19               Q    And you said some of them had already been
20 required or replaced.  Was Mr. --
21               A    No, sir, I changed them.
22               Q    You changed them.  Did MSHA, in fact, write
23 these two violations?
24               A    To the best of my knowledge.
```

John T. Viars v Greenbrier Minerals, LLC, et al  CA 5:15-cv-15410 on July 25, 2016

Sheet 24  Page 93

1    Q    After receiving this written warning, did you
2  understand that as it states if you continued to make
3  inadequate belt inspections, further disciplinary actions
4  could be taken against you?
5    A    I did.
6    Q    And did you understand as the warning states
7  that if you didn't improve your work habits, further
8  disciplinary action would be taken?
9    A    Loud and clear.
10   Q    Separate and apart from the events that led to
11 the April 7, 2015, warning, did you know that Mr. Crone and
12 Mr. Brada were generally dissatisfied with your performance on
13 the belts?
14   A    Please say that again.
15   Q    Separate and apart from these events that are
16 the subject of the April 7 write-up --
17   A    Right.
18   Q    -- did you know that Mr. Brada and Mr. Crone
19 were generally dissatisfied with your work performance on the
20 belts?
21   A    No.
22   Q    To your knowledge was this April 7 incident
23 the only problem they had with your performance?
24   A    Yes.

Page 94

1    Q    Did they talk to you about any other issues or
2  things they were not happy about relating to your work on the
3  belts between December 2014 and April 2015?
4    A    No.
5    Q    Right after the April 7 warning was issued,
6  were you taken out of the beltman/fire boss position and put
7  on utility?
8    A    That was after my mother's illness, that
9  occurred, after her surgery.
10   Q    When do you believe that occurred?
11   A    It seems to me like they put me up there in
12 June or the last of May.  I wasn't there very long.
13   Q    What did you understand to be the reason you
14 were removed from the belts and put on utility?
15   A    They needed a utility man.  Was given no
16 reason.
17   Q    And who told you that that decision had been
18 made?
19   A    Nathan Brada.
20   Q    And?
21   A    And also Earl Crone.
22   Q    Where they together?
23   A    No, not at the time.  I think Harold told me
24 about it, and then one day when I went by the office, Nathan

Page 95

1  mentioned it to me.
2    Q    And did both Nathan Brada and Earl Crone give
3  you the same reason?  They just needed somebody in utility?
4    A    Yes.
5    Q    Did they express dissatisfaction with your
6  work on the belts at all in connection with that move?
7    A    No, not at all.
8    Q    Correct that utility is essentially another
9  title for general laborer?
10   A    Yes.
11   Q    And were you an outbye utility or you utility
12 on a section?
13   A    On the section.
14   Q    So you were part of a production crew
15 reporting to a section foreman?
16   A    Yes.
17   Q    Who was your new section foreman when you were
18 put on utility?
19   A    T. J.
20   Q    That's T. J. Warden?
21   A    I think that's his last name, yes.
22   Q    Were you unhappy about being taken off belts
23 and fire bossing and put into a utility section?
24   A    No, I was not.

Page 96

1    Q    Why not?
2    A    Because I wanted off of it to be perfectly
3  honest.
4    Q    So you didn't view that as a negative move for
5  you?
6    A    No.
7    Q    Had you worked for Mr. Warden prior to this
8  period in May or June of 2015?
9    A    No.
10   Q    As a utility, what were your primary
11 responsibilities?
12   A    Maintain curtain on the section, maintain
13 brattices, which is stoppings, and when some of them was off,
14 I ran their equipment.
15   Q    Most days were you working on ventilation
16 issues, brattice and stoppings?
17   A    Yes.
18   Q    Or curtains?
19   A    Yes.
20   Q    According to your complaint, and let me
21 preface this, I know the situation with your mother, and I
22 just need to get facts.  I don't mean to be insensitive in any
23 questions I ask, okay?
24   A    Okay.

John T. Viars v Greenbrier Minerals, LLC, et al   CA 5:15-cv-15410 on July 25, 2016

Sheet 25   Page 97

```
 1       Q    Your mother underwent open-heart surgery on or
 2  about April 27, 2015?
 3       A    Yes, sir.
 4       Q    Now on or about is one of those phrases we
 5  lawyers use a lot which doesn't really mean much.  It can
 6  cover a broad range.
 7       A    Right.
 8       Q    Do you know was your mom's surgery, in fact,
 9  on April 27?
10       A    I can't remember the exact day.
11       Q    You recall if it was a Monday?
12       A    Yes, I do.  It was a Monday.
13       Q    Okay.  April 27 was a Monday.  That's why I'm
14  asking.
15       A    It was a Monday; that I remember.
16       Q    All right.  And am I correct that your
17  mother's surgery was initially scheduled to occur a week or
18  more before that but was postponed?
19       A    Yes.  Well, approximately, yes.
20       Q    Do you remember when the surgery was
21  originally supposed to take place?
22       A    The surgery was to take place anytime that
23  week that I was off.
24       Q    Anytime the week of April 21, the week before
```

Page 99

```
 1  made at least, off the top of my head, three trips over here
 2  to talk to the doctors and things that had to be done because
 3  I was her medical power of attorney.
 4                    (WHEREUPON, the Attendance Chart was
 5                    marked as Deposition Exhibit No. 10
 6                    for identification and a copy
 7                    attached hereto and made a part
 8                    hereof.)
 9       BY MR. ROBINSON:
10       Q    Are you an only child?
11       A    Yes.
12       Q    What we've marked as Exhibit No. 10 is a
13  document prepared by Greenbrier Minerals showing unexcused
14  time, excused time, suspension, vacation, personal and
15  bereavement time that you had taken between 2012 and 2015, and
16  I know you've not seen this before, but it doesn't do any good
17  to ask you these questions if I've misrepresented anything in
18  this document, so I want you to trust that this is what your
19  records would show.
20                    According to Greenbrier Minerals' record, you
21  took vacation on five days in 2015, that was April 22, 23, 24,
22  25 and 27.  Does that sound correct to you?
23       A    That would be five days?
24       Q    Yes, sir.  And that would be Tuesday, April
```

Page 98

```
 1  the surgery was actually done?
 2       A    Right.  The week before, right.  And I didn't
 3  -- actually I didn't - let me rephrase that.  It was I'm
 4  thinking a Wednesday that I found out that they were going to
 5  have to do it, and it could have happened anytime that week,
 6  but the reason that they didn't do it, she was completely
 7  blocked off, and the reason they didn't do it because she was
 8  on blood thinners and the doctor kept checking her blood, and
 9  he wasn't comfortable in doing it until Monday, and I stayed
10  on my leave, my own leave, until they took it and to my
11  records, I came back a day early.
12       Q    All right.  So they had to wait.  Did they
13  give your mom drugs to thicken her blood so that they could
14  safely do the surgery?
15       A    I don't recall them -- I'm sure she was on
16  medication, but I don't remember exactly what it was for.
17       Q    Could have been they took her off thinners so.
18       A    Right, they took her off of it.
19       Q    Okay.  The idea initially was for you to take
20  vacation so you would be off work the week following your
21  mom's surgery; is that fair?
22       A    The week of.  I just wanted to be on vacation
23  when they took it.  He could have done it at any time, and I
24  would have had to come to Charleston, and during that week I
```

Page 100

```
 1  22, Wednesday, April 23, Thursday, April 24, Friday  - no,
 2  excuse me, Wednesday, April 22, Thursday the 23rd, Friday the
 3  24th, Saturday the 25th and Monday the 27th.
 4       A    If they counted Saturday, yeah, that would be
 5  five days.
 6       Q    All right.  And I believe you indicated
 7  earlier this surgery was supposed to be on a Wednesday
 8  initially?
 9       A    Yes.
10       Q    And that would have been the 22nd then?
11       A    It could have been anytime that week.
12       Q    All right.  So the idea was April 22nd to do
13  the surgery and it was postponed.
14       A    It could have been anytime that week.
15       Q    All right.  And so as it turned out, the first
16  four days, the 22nd, 23rd, 24th and 25th days of vacation you
17  took were actually before your mother's surgery on April 27?
18       A    Say that again, please.
19       Q    As it turned out, this surgery was not done
20  until April 27, so the first four days of vacation took place
21  prior to the surgery?
22       A    Yes, but it could've taken place any of those
23  days.  It wasn't till Saturday -- excuse me, Friday that we
24  found out it was going to be Monday.
```

John T. Viars v Greenbrier Minerals, LLC, et al   CA 5:15-cv-15410 on July 25, 2016

Sheet 26   Page 101

```
1        Q      All right.  And originally when you took those
2   vacation days, your thought was she would have surgery
3   sometime that first week and you would be off for the surgery
4   and for a few days after?
5        A      I just wanted to be off for the surgery.
6        Q      The surgery itself?
7        A      Yes.
8        Q      So your concern is to be off that one day of
9   surgery?
10       A      Yes, and I was uncertain when it was going to
11  be so I had a week vacation so I took it.
12       Q      And was then your idea throughout that time
13  that the day after surgery, you would return to work?
14       A      Return to work.
15       Q      So you took five days knowing you were going
16  to use one of them?
17       A      Yes.
18       Q      When you first requested the vacation time the
19  week of April 22, to whom did you make that request?
20       A      Nathan Brada.
21       Q      Was that the practice of the mine that if you
22  wanted to request vacation time, you made that request to
23  either the mine superintendent or the general mine foreman?
24       A      I always thought it was the superintendent.
```

Page 102

```
1        Q      And Mr. Brada at the time was the
2   superintendent?
3        A      Yes.
4        Q      Do you remember when you made your request for
5   vacation leave to Mr. Brada?
6        A      Yes, I do.  It would have been on the first
7   day that it started.  It was on a Tuesday when we found out
8   about mom, and then that next day I called him.  He already
9   knew what was going on.  I called him.  He told me he had
10  checked with the office and he had checked with them, and he
11  said they approved my vacation, and I asked him I have 40
12  hours, right?  And he said, yes, 40 hours.  As you see here I
13  took no more that belonged to me.
14       Q      Right.  And so 40 hours would equal eight
15  hours per day for these five days listed on Exhibit 10?
16       A      Yes.
17       Q      All right.  Did you call Mr. Brada at home to
18  ask for that vacation, do you remember?
19       A      I did call him at home now that I call.  He
20  told me to call back the next morning and that's what I did.
21       Q      Okay.  So you originally called him at home on
22  April 21, Tuesday, April 21?
23       A      Yes.
24       Q      And to the best of your recollection, what
```

Page 103

```
1   specifically did you say to Mr. Brada when you called him on
2   April 21?
3        A      I told him what was going on with mom and she
4   had to have open heart surgery.  They wasn't sure when they
5   were going to be able to do it, but it was going to be within
6   the next few days, and he told me to check back, and I had
7   told him I just wanted to go ahead and take my vacation cause
8   I didn't want any unexcused time and told me to call back that
9   morning.  He told me it was granted.
10       Q      All right.  And did you explain to him that
11  you only really need one of those days, but you just didn't
12  know when the surgery was going to be so you were going to
13  take all five of them or all - or at least four of them?
14       A      I told them as soon as they done her surgery
15  and she was okay, I'd be back.
16       Q      Okay.  And beyond what you've already told us,
17  do you remember anything else about your discussions by
18  telephone with Mr. Brada on April 21 or April 22, 2015?
19       A      I do not.
20       Q      When did you learn that the surgery would not
21  be done until April 27?
22       A      On that Friday.
23       Q      Friday the 24th?
24       A      If that was Friday.
```

Page 104

```
1        Q      And do you recall if you reported at any time
2   during the first week; that is, the week of the 22nd, 23rd,
3   24th, did you report to anyone at the company that your mom's
4   surgery had been postponed?
5        A      I ran their phone off the hook.  No one would
6   answer.
7        Q      Do you remember if you did talk to anyone and
8   tell them that it had been postponed until the following
9   Monday?
10       A      Don't hold me to this, but I think I told
11  George Wheatley.
12       Q      So you did get him by phone at some point you
13  think?
14       A      I can't remember I got a hold of him on the
15  phone or the church I take care of is directly across from his
16  house.  I may have told him then.
17       Q      And I know this is foggy in your mind.  Do you
18  remember how Mr. Wheatley responded?
19       A      (No response.)
20       Q      Here's my understanding; you tell if it's
21  wrong.  It's my understanding that initially you had said I
22  want vacation for four days, the 22nd, 23rd, 24th and 25th.  The
23  company said okay, and when you realized that your mom's
24  surgery had been postponed until Monday the 27th, you had to
```

John T. Viars v Greenbrier Minerals, LLC, et al  CA 5:15-cv-15410 on July 25, 2016

Sheet 27  Page 105

1  call back and ask for an additional day; does that sound
2  familiar?
3       A    Yes, and that also sounds terribly wrong.
4       Q    It sounds correct but wrong?
5       A    It's wrong.
6       Q    Is that correct?
7       A    No.
8       Q    Okay, all right.  What do you recall
9  happening?
10      A    Exactly what I just told you.  My very words
11 to Nathan was I said I had 40 hours, right?  He said yes, 40
12 hours.  I said okay.  I said, hopefully, I don't need all of
13 them, but I'll be back as quick as she's taken care of.
14      Q    Do you remember calling Earl Crone at home and
15 asking for an additional day of vacation?
16      A    No, I do not.  I remember possibly trying but
17 it wasn't to ask for an additional day.  I may have tried to
18 call Harold to let him know what was going on because I felt
19 that they should be informed.
20      Q    Do you remember actually talking to Mr. Crone
21 about being off on Monday, April 27, the day of your mom's
22 surgery?
23      A    No, I do not.
24      Q    And as you can see from the attendance chart,

Page 106

1  sir, Exhibit No. 10, the vacation days you took in April were,
2  in fact, counted by Greenbrier Minerals as vacation days, were
3  they not?
4       A    Yes, they are.
5       Q    They were not counted as unexcused absences?
6       A    That's correct.
7       Q    You were paid for those days?
8       A    I was.
9       Q    And, in fact, according to this chart, you had
10 no unexcused absences at all in 2015; is that correct?
11      A    That's correct.
12      Q    And because they were counted as vacation
13 days, as you had requested, they were not counted as
14 chargeable absences or occurrences under the attendance
15 policy; is that right?
16      A    Say that one more time.
17      Q    Did you understand that under the company's
18 attendance policy, unexcused absences, for example, were
19 counted as chargeable absences or occurrences --
20      A    Yes.
21      Q    -- that would count against you?
22      A    Yes.
23      Q    And did you understand that these five days in
24 April were not counted as chargeable days because they were

Page 107

1  vacation days?
2       A    I did.
3       Q    At what hospital was your mom's surgery
4  performed?
5       A    CAMC.
6       Q    Memorial Division up in Kanawha City?
7       A    Yes.
8       Q    Your interrogatory answers list Dr. Kenneth
9  Sales as among your mom's treating physicians.  Did she him
10 for her heart condition?
11      A    I'm thinking she didn't see Dr. Sales until
12 after she had the surgery.
13      Q    Dr. Sales is a family physician?
14      A    Yeah, I'm pretty sure.
15      Q    Was she your mom's treating family doctor?
16      A    Yes.
17      Q    And I assume at some point Dr. Sales or
18 someone else referred your mom then to a cardiologist?
19      A    Well, she didn't have Dr. Sales until after
20 she'd had the open heart surgery.  She was at Logan.  Now I
21 think this is the physician's name, Dr. Malik from Logan, done
22 a cath on her and found the blockages and he sent her directly
23 to CAMC.
24      Q    And for the court reporter can you spell Dr.

Page 108

1  Malik's name?
2       A    It probably wouldn't be right.
3       Q    Close approximation.
4       A    M-a-u-i.
5       Q    Okay, well, like the island?
6       A    Right.
7       Q    All right.  Once your mom was referred to
8  CAMC, did she get a cardiologist here in Charleston?
9       A    She did.
10      Q    Who was her cardiologist here in Charleston?
11      A    I can't remember his name.
12      Q    And is it that cardiologists who also
13 performed her surgery at CAMC?
14      A    Yes.
15      Q    And then following her surgery she began
16 seeing Dr. Sales?
17      A    Yes.
18      Q    Do you recall what time of day your mother's
19 surgery occurred?
20      A    It started early in the morning.
21      Q    And, unfortunately, I know from personal
22 experience with these bypasses, it's safe to assume your mom
23 was unconscious most or all of the day?
24      A    Yes.

John T. Viars v Greenbrier Minerals, LLC, et al  CA 5:15-cv-15410 on July 25, 2016

Sheet 28  Page 109

```
1          Q     Did you actually have any contact with your
2  mother on April 27 the day of the surgery?
3          A     I did.
4          Q     What was the contact you had with her that
5  day?
6          A     I talked with her before they took her in and
7  that was the only contact because when she came out, she was
8  still unconscious.  Well, she was out, and I had to go home to
9  get ready for work.
10         Q     And then did you, in fact, report to the work the
11 following day, April 28?
12         A     I did.
13         Q     And you attended work each scheduled day
14 thereafter?
15         A     Except for the day that they called her to the
16 nursing - took her from the nursing home.
17         Q     Fair enough.  All right.  You did not request
18 any additional vacation time the week of April 27?
19         A     No.
20         Q     Am I correct that Greenbrier Minerals gave you
21 each and every vacation day you requested in April 2015?
22         A     They did.
23         Q     After returning to work on April 28, did you
24 return to your same utility job?
```

Page 110

```
1          A     I was still on the belts at that point.
2          Q     And I don't want to go over it again, but do I
3  remember correctly you don't recall exactly when you went --
4  then went from belts to utility?
5          A     Not specific days.
6          Q     In paragraph nine of your complaint, you
7  assert that "On or about June 1, 2015, plaintiff's mother's
8  condition worsened and she was moved from a nursing home to
9  the hospital.  Plaintiff Viars is the medical power of
10 attorney for his mother and as such took the day off to care
11 for his mother."  Are you familiar with allegation?
12         A     I am.
13         Q     And is that accurate?
14         A     Yes.
15         Q     In what nursing home was your mother residing
16 at the time?
17         A     The one at three mile curve, Genesis
18 Healthcare.  There's a name they call it, but I can't remember
19 what the name of it is.
20         Q     In what community is that located?
21         A     Logan, Logan County.
22         Q     Is that in Logan proper, city limits?
23         A     No, just outside of it.
24         MR. WALTERS:     Let's go off the record for just a
```

Page 111

```
1  second.
2                          (WHEREUPON, a discussion was had off
3                          the record, after which the
4                          proceedings continued as follows:)
5          BY MR. ROBINSON:
6          Q     And your mom was transported to what hospital
7  from the nursing home?
8          A     Logan Regional Medical Center.
9          Q     Had she been treated there before or was that
10 just the closest hospital?
11         A     It was the closest.
12         Q     Now how certain are you that your mother was
13 moved to the hospital on June 1 as opposed to another date?
14         A     I forget what the date was.  I'd be afraid to
15 assume.
16                          (WHEREUPON, the Work Release Form
17                          was marked as Deposition Exhibit No.
18                          11 for identification and a copy
19                          attached hereto and made a part
20                          hereof.)
21         BY MR. ROBINSON:
22         Q     The court reporter has handed you what we've
23 marked as Deposition Exhibit No. 11.  Do you recognize that
24 document, sir?
```

Page 112

```
1          A     I do.
2          Q     And that's a work release form that you
3  obtained from your mother's physician or actually the
4  emergency department at Logan Regional Medical Center?
5          A     It is.
6          Q     And you'll see it's dated June 10, 2015,
7  rather than June 1?
8          A     Okay.
9          Q     Is June 10 the date you actually accompanied
10 your mother from or met her at the hospital after she'd been
11 transferred from the nursing home?
12         A     If that's what this says.
13         Q     Let me ask you to go back for a minute to
14 Exhibit 10, the attendance chart you have in front of you.
15         A     (Witness complies.)
16         Q     You'll see in 2015 in the excused absence
17 column June 10, 2015?
18         A     I do.
19         Q     That corresponds with the day of the work
20 release form relating to your mom's medical treatment.  You
21 see that?
22         A     I see that.
23         Q     Okay.  So are we safe in using June 10 as the
24 date that she was transferred from the nursing home to the
```

John T. Viars v Greenbrier Minerals, LLC, et al  CA 5:15-cv-15410 on July 25, 2016

Sheet 29  Page 113

```
 1   hospital?
 2        A    Yes.
 3        Q    All right.  Did you at that time have a
 4   written medical power of attorney for your mother?
 5        A    Yes.
 6        Q    Do you still have a copy of it?
 7        A    I do.
 8        Q    Did you provide a copy of it to Logan General
 9   Medical Center?
10        A    I did.
11        Q    And did you provide a copy of it to the
12   nursing home as well?
13        A    I did.
14        Q    What is your mother's name?
15        A    Helen Mae Viars.
16        Q    And I understand your mom is now deceased.
17        A    Yes.
18        Q    And do you know approximately her date of
19   death?
20        A    August 26th of last year.
21        MR. ROBINSON:  Off the record.
22                (WHEREUPON, a discussion was had off
23                the record, after which the
24                proceedings continued as follows:)
```

Page 114

```
 1        BY MR. ROBINSON:
 2        Q    Mr. Viars, according to your interrogatory
 3   answers in this case, you received a call from the nursing
 4   home on June 10 telling you that your mother had been
 5   transported to the hospital; is that accurate?
 6        A    Yes.
 7        Q    Were you still at home when you received that
 8   call?
 9        A    I was.
10        Q    And what time was your mom taken to the
11   hospital, if you know?
12        A    I know by the time I got to her, it was
13   probably three or four o'clock in the morning, and I don't
14   recall what time that they actually brought her.
15        Q    Okay.  You physically went to Logan Regional
16   Medical Center?
17        A    Yes.
18        Q    What do you recall happening with regard to
19   your mother's medical care at the hospital that day?  What did
20   they do for her when you arrived and after you left?
21        A    They were trying to find out why that her
22   oxygen level had dropped so low, and they found out that she
23   had a great amount of fluid on her lungs, and they were going
24   to drain the fluid and they admitted her.
```

Page 115

```
 1        Q    You had the medical power of attorney.  Were
 2   you needed to exercise that at any point that day?
 3        A    Yes.
 4        Q    So you were making the decisions for your
 5   mom's healthcare?
 6        A    I was.
 7        Q    Was she admitted into the hospital?
 8        A    Yes.
 9        Q    How long did she stay there, if you remember?
10        A    She was in there a long time.  I can't really
11   give you a time.  It was close to maybe a month or better.
12        Q    Did she return to the nursing home prior to
13   her death
14        A    No.
15        Q    - from the hospital?  Did she leave the
16   hospital prior to her death?
17        A    Yes.
18        Q    Did she return home?
19        A    Yes.
20        Q    Your home?
21        A    Yes.
22        Q    On June 10 when she was admitted, was she
23   admitted to a regular room or some enhanced care like ICU or?
24        A    It was a, let's see, intensive care, CCU
```

Page 116

```
 1   matter of fact.
 2        MR. WALTERS:  Critical care.
 3        BY MR. ROBINSON:
 4        Q    Was that a cardiac care unit?
 5        A    Yes, critical care, cardiac care, I don't know
 6   what it stands for.
 7        Q    Okay.  But she was in bad shape?
 8        A    Yes, very.
 9        Q    And did she remain there all of June 10?
10        A    Yes.
11        Q    From the time you arrived at 3 or 4 p.m. until
12   the rest of the day?
13        A    Yes.
14        Q    After receiving the call from the nursing home
15   on June 10, did you call anyone at work?
16        A    I did.
17        Q    Who did you call?
18        A    My best remembrance is I got a hold of the
19   dispatcher, which if I'm remembering right, it was Terry
20   Grimmett.
21        Q    Last name again?
22        A    Grimmett.
23        Q    Grimmett?
24        A    He was the dispatcher on -- it could have been
```

John T. Viars v Greenbrier Minerals, LLC, et al   CA 5:15-cv-15410 on July 25, 2016

---

Sheet 30   Page 117

1  the third shift dispatcher.  I can't remember which one of
2  them boys I talked to.
3              Q       Do you recall the name of the third shift
4  dispatcher?
5              A       Face right in my head, but I can't remember
6  his name.
7              Q       Approximately what time did you call in?
8              A       It was way in the morning hours.  I can't
9  remember exact time.
10             Q       Okay.  And I think in a question a minute ago
11 I said 3 or 4 p.m.  You arrived there 3 or 4 a.m. on June 10?
12             A       It was a.m. hours.
13             Q       And you reported to Mr. Grimmett or the other
14 dispatcher what information?
15             A       Told her what had happened, that they had to
16 take my mother to the hospital from the nursing home and was
17 told to me that she was in pretty bad shape and I was needed
18 to go and to go be with her so I went.
19             Q       And what response did you receive to that?
20             A       He said I'll tell him when they come.  He was
21 talking about management.
22             Q       Okay.  Anything else you recall?
23             A       No.
24             Q       That was the full extent of the conversation?

---

Page 118

1              A       That was the full extent.
2              Q       Did you talk to anyone else from work on June
3  10?
4              A       Not that I recall.
5              Q       Did you return to work on June 11?
6              A       I did.
7              Q       You were not required to miss work to provide
8  care to your mother on that day?
9              A       I probably could've been there but I had to
10 make a living.
11             Q       And you came to work on June 12?
12             A       I did.
13             Q       June 12 was the day you were suspended.
14             A       Yes.
15             Q       Now when you returned to work on June 11, did
16 you give the work release form, Exhibit 11, to anyone?
17             A       I did.
18             Q       Who did you give it to?
19             A       Nathan Brada.
20             Q       And do you recall where that discussion took
21 place?
22             A       Outside of the mine office and actually I
23 ended up having to give it to Jamie New because Nathan
24 wouldn't take it.

---

Page 119

1              Q       What were the hours of your shift normally as
2  of June 10, 2015, June 11?
3              A       7:00 to 4:00.
4              Q       7 a.m. or p.m.?
5              A       7 a.m.
6              Q       And so when you came to work on June 11 with
7  the work release form in hand, did you see Mr. Brad at about 7
8  a.m. or shortly before 7 a.m.?
9              A       Before 7 a.m.
10             Q       And Mr. Brada was where when you saw him?
11             A       He was getting on a ride outside of the mine
12 office where they keep the rides to charging and he was
13 heading into the mines.
14             Q       And was Mr. New with him?
15             A       He was.
16             Q       And Mr. New's position was what at the time?
17             A       Mine foreman.
18             Q       Were there others present as well?
19             A       Not that I remember.
20             Q       So did you stop them when you saw them as they
21 were getting ready to enter the mine?
22             A       I did.  I approached Nathan.
23             Q       All right.  And tell me -- take it from there.
24 Tell me what you said and what he said in response?

---

Page 120

1              A       I come to Nathan and I said, "Nathan, here's
2  the excuse to where was at tomorrow with my mom," and he said,
3  "I ain't got time for all your blanking lies.  Give that $'
4  to Jamie."  That's exactly what he said.
5              Q       And you responded how?
6              A       I handed it to Jamie.  I said nothing.
7              Q       And did he elaborate on what he meant by your
8  lies?
9              A       He did not.
10             Q       Anything else you recall Mr. Brada saying
11 during that conversation?
12             A       No.
13             Q       That was it?
14             A       That was it.
15             Q       That one statement?
16             A       That one statement.
17             Q       How about Mr. New, did he say anything during
18 the conversation?
19             A       I handed him the excuse.  He said okay, best
20 to what I can remember.
21             Q       Was that the extent of that entire interaction
22 between you, Mr. New and Mr. Brada prior to 7 a.m. on June 11?
23             A       You're saying prior to 7 a.m., well, when I
24 come back from my vacation, Nathan cussed me as well.

John T. Viars v Greenbrier Minerals, LLC, et al  CA 5:15-cv-15410 on July 25, 2016

**Sheet 31  Page 121**

```
1            Q     Okay, we'll get into that in a minute.  Let's
2  stick with June 11 for a minute.
3            A     You said prior to 7 a.m., that would be very
4  much prior.
5            Q     It would be very much prior.  We'll go back.
6            A     Okay.
7            Q     On June 11 was that the extent of any
8  interaction you had with Mr. Brada and Mr. New with regard to
9  your work release form?
10           A     Yes.
11           Q     Okay.  Did you talk to Mr. Brada or Mr. New at
12 any other time that day, June 11?
13           A     I don't recall talking to them, no.  I may
14 have, maybe just something about work or maybe said something
15 to him, but as far as about that matter, no.
16           Q     Nothing with regard to either the form or you
17 being absent from work on June 10?
18           A     No.
19           Q     All right.  Let's go back and fill in the gap.
20 When you returned from vacation, you're referring to vacation
21 in April of 2015?
22           A     Yes.
23           Q     And you said Mr. Brada made a comment to you
24 when you returned from vacation.
```

**Page 122**

```
1            A     Yes.  I didn't see Mr. Brada until the end of
2  the shift.  I was -- that's on my way home, and I went in
3  after I came outside to fill out my fire boss book or no, no,
4  I'm wrong.  I was on the section by then, or no, I stand to be
5  corrected again.  They had somebody -
6            Q     Go ahead and think it out.  We're not in a
7  race here.
8            A     They pulled me off that day to work belts
9  cause somebody was absent, okay, and I remember clearly now,
10 and I was going in to fill out the fire boss book, and Nathan
11 was on his way out of that office and he looked and saw me,
12 and he said, "Well, John T., we're glad you can  f'ing' join
13 us finally," and I just let him go.
14           Q     Do you recall what date that comment might
15 have been made on?
16           A     It was the day I came back from vacation.
17           Q     April 28th?
18           A     Whatever the day I come back was.  I believe
19 that was the day.
20           Q     I'm glad you can "f'ing" join us?
21           A     Yes.
22           Q     Who else was present when that comment was
23 made?
24           A     There were people in the office.  I do
```

**Page 123**

```
1  remember that T. J. Warden was one of them, and there were
2  other folks, but I can't exactly remember who all was in
3  there.  I'd be afraid to make an assumption on that.
4            Q     Okay.  How did you respond to Mr. Brada's
5  comment?
6            A     And I said -- I didn't say a word.
7            Q     All right.  From the time you first requested
8  vacation in April 2015 until you were suspended on June 12,
9  did Mr. Brada make any comments to you other that than the two
10 you've told us about already?
11           A     No.
12           Q     When Mr. Brada made the comment after you
13 returned from vacation in April, did Mr. Warden say anything?
14           A     No.
15           Q     Did anyone else say anything?
16           A     No.
17           Q     So it was, essentially, Mr. Brada making his
18 comment and you walking away?
19           A     Yes.
20           Q     In any event you were given the day off as you
21 requested on June 10 to be with your mother at the hospital?
22           A     I didn't know at the time that it was excused,
23 no.  He didn't say anything to me.
24           Q     Well, when you came back to work and gave them
```

**Page 124**

```
1  the work release form on June 11, how did you think the
2  absence would be treated?
3            A     I believed it would be unexcused.
4            Q     You thought it would be unexcused?
5            A     Yes.
6            Q     Why did you think it would be unexcused?
7            A     Because I've seen them on many, many
8  occasions, didn't matter if you had an excuse or not.  If you
9  didn't have a date to back the absence up, it was unexcused
10 and you received an occurrence for it.
11           Q     Let me ask you look please back to Exhibit 10,
12 the attendance chart.
13           A     (Witness complies.)
14           Q     You'll see that for both 2013 and 2015, there
15 are no unexcused days counted against you those years.  Do you
16 see that?
17           A     20 what now?
18           Q     2013 and 2015 you had no unexcused days
19 according to this chart, right?
20           A     No.
21           Q     There are three unexcused absences listed in
22 2012.  To your knowledge, were any of those unexcused absences
23 situations such that you just described where you provided
24 work release forms or medical excuses, and they still counted
```

John T. Viars v Greenbrier Minerals, LLC, et al  CA 5:15-cv-15410 on July 25, 2016

**Sheet 32   Page 125**

1  absences against you?
2          A       Yes, I know they were.
3          Q       You believe that all three of those absences
4  fall under that circumstance?
5          A       I don't know if it was all three but I know
6  some of them.
7          Q       You think one, two or three of those absences
8  that they counted as an unexcused, you actually had some
9  excuse for?
10         A       I'm just guessing in the answer.
11         Q       And we don't want you to guess cause this is
12  sort of -- you know, under oath you say something --
13         A       Yeah.
14         Q       -- people try to take it as gospel and so if
15  you're not sure, just say I don't know.
16         A       I don't know.
17         Q       Okay.  All right.  And then in 2014 there are
18  two days listed, August 23 and September 22.  Do you know if
19  any of those days fell into the category you just described
20  where you had an excuse, but they were counted as unexcused
21  nonetheless?
22         A       I don't know.
23         Q       Okay.  So in your own personal history, you
24  don't know if there had ever been days where you gave an

**Page 126**

1  excuse, but the company nevertheless counted it as an
2  unexcused absence against you?
3          A       I know there was days they did, but I can't
4  remember what it was for and when it was.
5          Q       All right.  And staying on Exhibit No. 10, you
6  see that at least according to this chart, your absence on
7  June 10, 2015, was recorded as an excused absence?
8          A       I see that.
9          Q       And if indeed it was counted as an excused
10  absence under the attendance policy, then it would not count
11  against you in terms of points against your attendance record,
12  right?
13         A       That's correct.
14         Q       And do you have any factual basis for
15  disputing that the June 10 absence was not counted against you
16  as a chargeable absence under the company's attendance policy?
17         A       According to this book.
18         Q       And you have no reason to think it's wrong?
19         A       No.
20         Q       All right.  Was T. J. Warden still your direct
21  supervisor as of June 10?
22         A       Yes.
23         Q       To your knowledge, was he aware of any of the
24  circumstances surrounding your mother's surgery in April 2015?

**Page 127**

1          A       Yes.
2          Q       And what do you base that on?
3          A       Cause I told him.
4          Q       What did you tell Mr. Warden?
5          A       When I came back to work from my vacation, I
6  know he asked me how my mother was and I told him, and I had
7  had a conversation or two in the fire boss room with him about
8  my mother.
9          Q       Before or after the surgery?
10         A       After.
11         Q       So do I understand your discussions with Mr.
12  Warden relating to your mom's medical condition occurred after
13  her surgery on April 27?
14         A       Yes.
15         Q       To your knowledge, was Mr. Warden aware of any
16  of the circumstances surrounding your absence on June 10?
17         A       Say that one more time.
18         Q       Did you ever have discussion with Mr. Warden
19  about the circumstances surrounding your absence on June 10?
20         A       I can't remember if I spoke to him about what
21  was going on or not.
22         Q       Sitting here today, do you have any reason to
23  believe he knew about the circumstances behind your absence on
24  June 10?

**Page 128**

1          A       I believe he did.
2          Q       And what do you base that on?
3          A       I would say that they told him why I called
4  in.
5          Q       Are you guessing?
6          A       I am.
7          Q       Okay, let's not.  Do you have any factual
8  basis for saying that he knew the circumstances behind your
9  absence on June 10?
10         A       No, sir.
11         Q       Okay.  Did you ever discuss with Mr. Warden
12  the exchange that you had with Mr. Brada on June 11?
13         A       No.
14         Q       To your knowledge, was he aware of that
15  conversation?
16         A       Not that I'm aware of.
17         Q       You never discussed that issue with Mr.
18  Warden?
19         A       No, I didn't.
20         Q       How about George Wheatley.  I don't think
21  we've talked about him much.  Did you have a good relationship
22  with him?
23         A       I did.
24         Q       Did he treat you fairly?

John T. Viars v Greenbrier Minerals, LLC, et al  CA 5:15-cv-15410 on July 25, 2016

Sheet 33  Page 129

```
 1         A    He did.
 2         Q    All right.  To your knowledge, was he aware of
 3  any of the circumstances surrounding your mother's surgery in
 4  April 2015?
 5         A    He was.
 6         Q    And you say he was based on what, sir?
 7         A    Because when I went home and found out that
 8  she was going to have that surgery, I went back to the mines,
 9  Nathan had already left.  George was the only one there, and I
10  told him what was going on.
11         Q    So he knew your mom was going to have the
12  surgery?
13         A    Yes.
14         Q    And he knew that you were going to take off so
15  you could be with her the day she had the surgery?
16         A    He knew I was trying to make arrangements to
17  be off.
18         Q    To your knowledge, was Mr. Wheatley aware of
19  any of the circumstances surrounding your absence on June 10?
20         A    I don't know.
21         Q    You never discussed that issue with Mr.
22  Wheatley?
23         A    No, sir.
24                   (WHEREUPON, the Disciplinary Action
```

Page 130

```
 1                   Form was marked as Deposition
 2                   Exhibit No. 12 for identification
 3                   and a copy attached hereto and made
 4                   a part hereof.)
 5  BY MR. ROBINSON:
 6         Q    And I apologize to everyone for the dark color
 7  of this exhibit, but it's the only way we could make it
 8  legible.  Do you recognize, Mr. Viars, a document we've marked
 9  as Exhibit No. 12?
10         A    I do.
11         Q    This is a disciplinary action form dated June
12  12, 2015?
13         A    Yes.
14         Q    And you'll see that above the employee's
15  signature line, about two-thirds of the way down, someone
16  wrote the word refused; do you see that?
17         A    Yes.
18         Q    Did you refuse to sign this document?
19         A    I did.
20         Q    Do you know who wrote in the word refused?
21         A    Mr. Wheatley.
22         Q    By whom were you given this disciplinary
23  action form on June 12, 2015?
24         A    Who gave it to me?
```

Page 131

```
 1         A    Yes, sir.
 2         A    George Wheatley.
 3         Q    Was Mr. Pauley also present?
 4         A    No.
 5         Q    In the brief -- well, take that back.  In the
 6  Reasons for Discipline section of this form, they marked the
 7  "X" Overall Performance; do you see that?
 8         A    I do.
 9         Q    And then in the Brief Explanation section, it
10  says, "John has been talked to about his quality of work on
11  various other occasions.  He will be suspended until notified
12  by human resources."  Do you see that?
13         A    I do.
14         Q    Do you understand that that's the stated
15  reason for suspending you on June 12?
16         A    I do.
17         Q    And did Mr. Wheatley tell you that that was
18  the reason for your suspension on June 12?
19         A    He did.
20         Q    Other than saying this is the reason for
21  letting you go, did he say anything else to you on June 12
22  when he gave you this form?
23         A    He just told me that Nathan -- he didn't know
24  anything about what went on.  Nathan told him to give me this.
```

Page 132

```
 1         Q    And do you know who had been particularly
 2  upset that day about the quality of your work?
 3         A    I know Nathan for sure.
 4         Q    Did you have any discussions with Mr. Warden
 5  that day about work you had performed?
 6         A    I did.
 7         Q    Tell me about your discussions with Mr. Warden
 8  that day?
 9         A    Okay, the best that what I can remember, I was
10  building the brattice, and I may add that it was a pretty big
11  one, and we were building the brattice.  He come over to me
12  and he said this has got to be done by quitting time, and I
13  said I'm doing everything I can, is what I told him.  And he
14  went to saying, if you don't have it done, you'll have to stay
15  over.  I said whatever it takes.  Well, I didn't have it
16  completed by the time that the crew left the section, and I
17  stayed tell it was.
18         Q    All right, let's break that down.  As I
19  understand it, Mr. Warden came to you and said I need you to
20  erect this brattice by the end of the shift?
21         A    Yes.
22         Q    And for the record, the brattice you were
23  constructing that day was made of cloth material or was it a
24  cinder block stopping?
```

John T. Viars v Greenbrier Minerals, LLC, et al  CA 5:15-cv-15410 on July 25, 2016

**Sheet 34   Page 133**

```
1          A    Solid block.
2          Q    And he came to you and made the request to
3  you, as I understand it, sometime that morning; is that fair?
4          A    No.
5          Q    What do you recall about when the request was
6  made that you construct this brattice?
7          A    Well, I knew that the supplies were over there
8  around noonish, but he had me doing other things, and then he
9  said, hey, you got to go build that brattice and by the time I
10 got over there to build it, it was probably between, just a
11 rough estimate, one, two o'clock in the day.
12         Q    All right.  So the supplies to build the
13 brattice on June 11 were delivered to your area around noon
14 that day?
15         A    That's correct.
16         Q    But as I understand what you're saying,
17 because you were doing other things, you didn't actually start
18 building it until sometime between 1:00 and 2:00?
19         A    That's right.
20         Q    And around three o'clock that afternoon, did
21 Mr. Warden return to the area to check on your progress in
22 building the brattice?
23         A    He did.
24         Q    And the brattice was not complete?
```

**Page 134**

```
1          A    That's correct.
2          Q    Fair to say that Mr. Warden was displeased
3  that the brattice hadn't been completed?
4          A    He didn't tell me he was.
5          Q    Did he tell you that three hours from the time
6  those materials were delivered should have been plenty of time
7  for you to build it?
8          A    He did not.
9          Q    Did he direct you to remain in the area and
10 continue into the next shift until you completed the brattice?
11         A    He did.
12         Q    And did you, in fact, complete it?
13         A    I did.
14         Q    Do you recall approximately what time?
15         A    Approximately, the time that the brattice was
16 finished was probably about four o'clock, between four and
17 five, I'll say that.
18         Q    I guess we're talking about the end of your
19 shift.  We should be more specific.  Your shift was scheduled
20 to end at 3:00?
21         A    No, sir, 4:00.  We left the section probably
22 between 3:15 and 3:30 every day.
23         Q    All right.  So how long - in your view how
24 long did you have to stay over into the next shift to complete
```

**Page 135**

```
1  the brattice?
2          A    Well, I completed it, like I said, between
3  4:00 and 5:00, but I didn't get outside till nine o'clock.
4          Q    You didn't have a ride?
5          A    That's right.
6          Q    When you completed the brattice between four
7  and five o'clock, was Mr. Warden still at the mine?
8          A    I wouldn't know.  I was inside and he was
9  outside.
10         Q    Did you know that Mr. Warden was unhappy with
11 the situation?
12         A    He didn't say he was.
13         Q    Did you detect that he was?
14         A    I be guessing again, wouldn't I?
15         Q    Well, I'm not asking you to guess.  Based on
16 your observations, did you observe that he was upset or you
17 didn't know?
18         A    He didn't appear to be.
19         Q    All right.  But you're catching on.  Good
20 catch.  Do you remember if there had been another incident
21 earlier that week with your construction of another brattice?
22         A    Yes.
23         Q    Tell me about that.
24         A    Okay, I know the one you're talking about.  I
```

**Page 136**

```
1  built a stopping and the bottom was busted up real bad, and it
2  was very difficult to get the block to set in there straight
3  and to be level, and I done the best that I could with it.  He
4  come over there and he starts cussing about it.  The cuss
5  words he said, Lord, he said so many, I couldn't tell you what
6  he said.
7          Q    He being Mr. Warden?
8          A    Yes.  Anyway I told him, I said, "Yeah, it's
9  leaning.  I know it's leaning, T. J."  I said, "I'm starting
10 from one end and taking it to the top all the way across so it
11 don't fall," and I said, "I believe it will be okay," and he
12 said, "Man, that would hurt somebody," and I said, "Well, if I
13 get through the top and get it plastered, I think it will be
14 okay," and at that point he went away.  Nothing else was ever
15 said.
16         Q    Did he tell you he felt during this discussion
17 where he said he was afraid it would tip, was it clear that he
18 thought there was a safety issue, this might fall on somebody?
19         A    Yes.
20         Q    Did you rebuild that brattice or did you
21 continue to construct it?
22         A    Continued to construct it.
23         Q    And was it completed?
24         A    It was.
```

John T. Viars v Greenbrier Minerals, LLC, et al   CA 5:15-cv-15410 on July 25, 2016

Sheet 35   Page 137

```
1         Q    Do you recall when that incident occurred?
2         A    No.  It was a few days before.
3         Q    Okay.  And, in fact, that incident was before
4  you took the day off on June 10 or yes, June 10?
5         A    I don't know.
6         Q    Fair to say that you knew on that occasion
7  when you were building the stopping that was leaning, that Mr.
8  Warden was dissatisfied with the quality of your work on that
9  occasion?
10        A    Well, sir, it's hard to tell.  Just before he
11  did, he told me that I was doing a fine job and I was a hard
12  worker.  Then he come over there and said that stopping was
13  leaning.  He didn't say directly that he was dissatisfied.  He
14  said it was leaning, and I told him what I was going to do to
15  correct it and that's all that was said.
16        Q    When you came to work on June 12, were you
17  given a copy of this suspension notice, Exhibit 12?
18        A    I was.
19        Q    And was it given to you during a meeting with
20  Mr. Brada and Mr. Pauley?
21        A    No.
22        Q    Who was present?
23        Q    You mean this here, right?
24        A    Yes, sir.
```

Page 138

```
1         A    Only me and George Wheatley.
2         Q    Mr. Wheatley.  What do you recall of that
3  meeting?
4         A    I just told you a while ago.  He just come
5  with this form, and he said, "Nathan wanted me to give you
6  this."  He said, "I don't know what happened."  He said
7  something about a stopping, and he said, "I've got to suspend
8  you."
9         Q    Did you talk to Mr. Pauley at all about this
10  suspension on June 12?
11        A    I went down to the office.  That's the first
12  place I went, the main office, but I can't remember if I got a
13  hold of Jack that day or it was a day or so after this, but I
14  did speak to him.
15        Q    And what do you recall about that discussion
16  with Mr. Pauley?
17        A    He just said that he was going to check to see
18  what happened and he told me that I would probably go back to
19  work and it ended up going the other way.
20        Q    Your discussion with Mr. Pauley would've been
21  by telephone?
22        A    I don't think I every spoke to him on the
23  phone.  I think I spoke to him in person.
24        Q    So any discussion you had with him about the
```

Page 139

```
1  suspension would've been on the 12th, the same day you got the
2  notice, cause you weren't on the premises the rest of the
3  time, right?
4         A    No, it could've been after the 12th.
5         Q    While you were on suspension, did you come on
6  to mine property?
7         A    Yes, I did.  I don't know -- at the office,
8  the main office, not where the mine is, the main office.
9         Q    And anything else you recall discussing with
10  Mr. Pauley?
11        A    No.
12        Q    Did you talk with Mr. Brada at all on June 12?
13        A    No.
14        Q    Did you talk to him at anytime between June 12
15  and your discharge on June 18?
16        A    No.
17        Q    And with regard to Mr. Pauley, did you talk to
18  him at any time other than what you just told me between June
19  12 and June 18?
20        A    I did.
21        Q    You talked to him on another occasion?
22        A    A couple of different times.
23        Q    You told me about one conversation I think,
24  right?
```

Page 140

```
1         A    Right, but I know I went down a couple
2  different times.
3         Q    What was the other discussion you had with Mr.
4  Pauley?
5         A    It was about the suspension.  He just said
6  that he didn't know what was going to happen yet.
7         Q    Okay.  Between June 12 and June 18, did you
8  have discussion with anyone else in Greenbrier Minerals
9  management relating to your suspension or what might happen?
10        A    Yes.
11        Q    Who else did you talk to?
12        A    Bill McCoy, if I'm remember his name right,
13  general mine manager.
14        Q    And when did you talk to Mr. McCoy?
15        A    During the time that I was suspended.  I can't
16  remember if it was the day that they suspended me or before
17  that they finally discharged me.
18        Q    And was that also a face-to-face discussion?
19        A    It was.
20        Q    What did you and Mr. McCoy talk about?
21        A    He was talking about how they were -- he had
22  talked to Nathan about it, and they were checking with some of
23  my supervisors and things of that that nature, and he said
24  that Nathan mentioned to him that he thought that I took
```

John T. Viars v Greenbrier Minerals, LLC, et al   CA 5:15-cv-15410 on July 25, 2016

Sheet 36  Page 141

```
 1  advantage of him when I took off for my mother.  He admitted
 2  that to me.  He said Nathan was upset because of that.
 3             Q      Was anyone else present during that discussion
 4  with you and Mr. McCoy?
 5             A      Just me and him.
 6             Q      Where did it take place?
 7             A      In this office.
 8             Q      About how long did you talk to him?
 9             A      10, 15 minutes if it was that long.
10             Q      Do you recall anything else about the
11  conversation?
12             A      No.
13             Q      Why were you - while suspended why were you
14  going on to mine property to talk to Mr. Pauley and Mr. McCoy?
15             A      Because I was trying to find out if I was
16  going back to work or I was going to have to start looking for
17  a job.  I wanted an answer one way or the other.
18             Q      When you were suspended by Mr. Wheatley, were
19  you given any time frame?
20             A      No.
21             Q      Or how long it might take to make the
22  decision?
23             A      No.
24             Q      When you were suspended, did he give you any
```

Page 142

```
 1  instructions about coming on to mine property?
 2             A      No.
 3             Q      You thought it was okay to do that even though
 4  you were suspended?
 5             A      I did.  I never came to the War Eagle Mines.
 6             Q      I'm sorry?
 7             A      I never came to the War Eagle Mines.
 8             Q      All right.  Where in relation to the work
 9  where War Eagle Mine is the office were Mr. Pauley and Mr.
10  McCoy were located?
11             A      Rich Creek.
12             Q      How far is that from the mine?
13             A      Approximately six miles.
14             Q      Okay.  So you did not go onto mine property?
15             A      Now that is a guess.
16             Q      All right.  But it's an educated guess?
17             A      Right.
18             Q      All right.  Up to June 12, 2015, when you were
19  suspended, had anyone other than Mr. Brada made any comment to
20  you about your use of vacation time?
21             A      Repeat that please.
22             Q      Up until the time you were suspended, had
23  anyone other than Mr. Brada made any kind of comment to you
24  about your use of vacation time in April?
```

Page 143

```
 1             A      No.
 2             Q      And up until the time of your suspension had
 3  anyone else made a comment to you about your absence on June
 4  10?
 5             A      No.
 6             Q      Leaving aside your claims in this lawsuit for
 7  now, do you have knowledge of any instance in which Greenbrier
 8  Minerals ever interfered with another employee's rights under
 9  the FMLA?
10             A      Not to my knowledge.
11             Q      And again leaving aside your claim, do you
12  have knowledge of Greenbrier Minerals ever retaliating against
13  another employee for exercising his or her rights under the
14  FMLA?
15             A      I never knowed anyone that was on it.
16             Q      Okay.  To your knowledge, did the company ever
17  violate the statute?
18             A      No.
19             Q      At anytime during your employment with
20  Greenbrier Minerals, do you know if an employee initiating any
21  litigation against the company for alleged violations of the
22  FMLA?
23             A      Yes.
24             Q      Who else initiated litigation against them?
```

Page 144

```
 1             A      I don't know the man's name, but it was at the
 2  Powellton mines.  I heard about it.
 3             Q      Heard about it how?
 4             A      People talk.
 5             Q      Yes, they do.  And you heard about it when?
 6             A      Actually after that day they discharged me.
 7             Q      So who did you learn of a possible previous
 8  lawsuit at the Powellton mines from?
 9             A      I just heard folks talking.  I can't remember
10  who I heard it from but I did hear it.
11             Q      Well, let me do my own guessing here.  What
12  I'm picturing in my head is you mentioned I got fired.  I
13  think it's cause I took FMLA, and somebody said, hey, I heard
14  so-and-so over at the Powellton mine got fired for the same
15  reason.  Is that about it?
16             A      Yes.
17             Q      Okay.  But you don't know who that person, if
18  they exist, was?
19             A      No.
20             Q      Are you aware of any investigation by the U.S.
21  Department of Labor relating to the FMLA at Greenbrier
22  Minerals?
23             A      No.
24             Q      After being suspended, were you asked to
```

John T. Viars v Greenbrier Minerals, LLC, et al   CA 5:15-cv-15410 on July 25, 2016

**Sheet 37   Page 145**

1  attend a meeting with the Greenbrier Minerals management on
2  June 18?
3          A    Yes.
4          Q    And did you, in fact, attend such a meeting on
5  June 18?
6          A    I did.
7          Q    Who else was present at that meeting?
8          A    It was myself, Nathan Brada, Bill McCoy, the
9  mine manager, and Jack Pauley.
10         Q    And where did the meeting take place?
11         A    In Nathan Brada's office at the Lower War
12 Eagle mines.
13         Q    How long did that meeting last?
14         A    15 minutes.
15         Q    Is it correct that Mr. Pauley did all the
16 talking at the meeting from the Greenbrier Minerals side?
17         A    No.
18         Q    But you recall other people speaking up during
19 that meeting?
20         A    I do.
21         Q    Who else talked during the meeting?
22         A    Everyone in the room.
23         Q    Mr. McCoy, Mr. Brada, as well Mr. Pauley?
24         A    As well as myself.

**Page 146**

1          Q    What do you recall being said by Mr. Pauley
2  during the meeting?
3          A    Him telling me that - he said, "John, I told
4  you I was going to check with bosses," and he said,
5  "Everybody's got the same thing to say, that you're slacking,"
6  this and that, and then Nathan brought up - said that one
7  time he had some forms there, and I don't see them here today,
8  that I cut the cable three times in one shift, and I said,
9  "Who wrote that?  Who wrote them up?"  I said, "I haven't cut
10 three cables in one shift in my entire life," and he was
11 saying he had all these things, and some of the stuff I didn't
12 even know what he was talking about, and then Mr. McCoy just
13 said, "Look, due to what we found, we don't want to have to do
14 this, but we're going to have to let you go."  And then Jack
15 said, "Well, if we fire him, said we'll have to give him -- he
16 won't be able to get on unemployment.  He'll have to fight for
17 it."  Said, "So we're just going to go ahead and lay him off."
18 He said, "Would you take a layoff?"  I said, "Yeah."  So he
19 gave me a layoff slip later that day.
20         Q    Anything else you remember being said during
21 that meeting?
22         A    That is all I remember.
23         Q    And do you remember, other than what you've
24 already said in response to the comment about cutting the

**Page 147**

1  cable three times in one shift, do you remember anything you
2  said during the meeting?
3          A    Yeah, I asked him - about the only thing I
4  can recall saying, you know, I tried to tell about the
5  brattice, that it didn't take me as long as they were saying.
6  I didn't get outside till nine o'clock, but it definitely
7  didn't take me that long to build it, and I told them I can't
8  -- I don't know what he's talking about cutting these three
9  cables, and I just told him how hard I've worked for the
10 company and how much coal I'd hauled for them over the years,
11 and they weren't trying to hear none of that.
12         Q    Is it correct to say that what you took from
13 all of their comments was their stated reason for letting you
14 go is unsatisfactory job performance?
15         A    That's what they were saying.
16         Q    And based on what you've told me there was no
17 discussion whatsoever of attendance issues?
18         A    No.
19         Q    Attendance was not cited among the reasons for
20 your discharge?
21         A    No.
22         Q    There was no discussion of your April 2015
23 vacation days?  There was no discussion of your excused .
24 absence on June 10?

**Page 148**

1          A    No.
2          Q    You brought up the unemployment issue.  Do you
3  remember if you expressed concern that you might not qualify
4  for unemployment if you were fired rather than laid off?
5          A    I did.
6          Q    And was the decision to allow you to be "laid
7  off" instead of discharge in response to your concern?
8          A    Jack Pauley is the one who come up with the
9  idea.
10         Q    Yeah.  Let me restate it and you tell me if
11 I've got it right.  It's my understanding that you expressed
12 to them concern that you might not qualify for unemployment if
13 you were fired.  In response Jack says, well, we can call it a
14 layoff rather than a discharge; that way we don't have to
15 worry about it and you said that works for me?
16         A    That's correct.
17         Q    Okay.  And it was, in fact, considered a
18 layoff; that's what they called it?
19         A    It was a layoff.
20         Q    And you agreed that your severance would be
21 characterized as a layoff rather than a discharge?
22         A    Yes.
23         Q    And Mr. Pauley, in fact, gave you a layoff
24 notice later that day?

John T. Viars v Greenbrier Minerals, LLC, et al  CA 5:15-cv-15410 on July 25, 2016

Sheet 38  Page 149

```
 1         A    He did.
 2         Q    And did you, in fact, receive unemployment
 3   compensation benefits immediately?
 4         A    I did.
 5         Q    Was everyone cordial during the June 18
 6   meeting?
 7         A    Explain yourself.
 8         Q    Was everybody nice?
 9         A    How nice can you be in a situation like that?
10         Q    I know.  Let me ask it another way.  Did
11   everyone behave professionally?
12         A    Yes.
13         Q    Did everyone talk respectfully to one another?
14         A    Yes.
15         Q    There was no screaming or yelling?
16         A    No.
17         Q    There was no cussing?
18         A    No.
19         Q    You weren't called names?
20         A    No.
21         Q    I think you said the meeting took place in Mr.
22   Brada's office.
23         A    Yes.
24         Q    Was the door closed?
```

Page 150

```
 1         A    Yes.
 2         Q    The meeting was handled with privacy?
 3         A    It was.
 4         Q    You were not let go in front of a group of
 5   your coworkers?
 6         A    No.
 7         Q    You were not escorted out or paraded in front
 8   of your coworkers?
 9         A    No.
10         Q    You were not physically touched by anyone
11   during the discharge meeting?
12         A    No.
13         Q    Law-enforcement wasn't brought into the
14   meeting for any reason?
15         A    No.
16         Q    Private security wasn't brought in?
17         A    No.
18         Q    You weren't walked off the property?
19         A    No.
20         Q    The meeting ended and you went home?
21         A    That's correct.
22         Q    Do you know who was involved in the
23   decision-making process that led to your discharge?
24         A    Nathan Brada.
```

Page 151

```
 1         Q    Do you know who else?
 2         A    That's all I heard them talk about is Nathan.
 3   He made the decision.
 4         Q    Do you know what documents might have been
 5   reviewed by the decision-makers?
 6         A    Excuse me?
 7         Q    Do you know what documents were reviewed by
 8   the decision-makers?
 9         A    Well, they said what you've showed me here
10   today and then he had some that I don't see here nowhere about
11   the cable cutting three in one shift.
12         Q    Did they tell you they had gone back and
13   reviewed your entire work history record?
14         A    Not my entire work history.
15         Q    But it was clear from the discussion they had
16   gone back and looked at your previous warnings?
17         A    Yes, with that company.
18         Q    What is the factual basis for your claim that
19   Greenbrier Minerals interfered with your rights under the
20   FMLA?
21         A    Well, it was my understanding after this had
22   already had taken place, that it was that company's
23   obligation, especially were I was my mother's medical power of
24   attorney and she had a life-threatening illness, that they
```

Page 152

```
 1   were supposed to offer me FMLA and instead I had to take my
 2   own vacation.
 3         Q    So it's the fact they didn't notify you that
 4   you had an option of taking FMLA that you see as the
 5   interference with your rights?
 6         A    Yes.
 7         Q    Correct to say you never did actually fill out
 8   any forms or other documents seeking FMLA leave?
 9         A    No.
10         Q    And you didn't fill out any documents seeking
11   FMLA leave in connection with either the April vacation
12   absences or the June absence?
13         A    That's right.
14         Q    Did you ever go to your mom's physician or
15   other treatment providers and ask them to fill out any FMLA
16   paperwork?
17         A    No.  I didn't even know that I could get it.
18         Q    Did you ever discuss with anyone at Greenbrier
19   Minerals the question of whether the FMLA might apply to your
20   absences?
21         A    No.
22         Q    No one at Greenbrier Minerals told you that
23   you should not take FMLA leave?
24         A    No.
```

John T. Viars v Greenbrier Minerals, LLC, et al   CA 5:15-cv-15410 on July 25, 2016

Sheet 39  Page 153

```
1              A      No one told you that if you filled out FMLA
2   paperwork, some particular person would be upset with you?
3              A      No.
4              Q      No one said if you filled out FMLA paperwork,
5   there would be ramifications of some kind against you?
6              A      No.
7              Q      Or that it would negatively impact your job?
8              A      No.
9              Q      Other than the fact that you feel the company
10  should have informed you of your right to take FMLA leave with
11  regard to your absences, anything else that you believe
12  support your interference claim?
13             A      Other than the fact that I feel that they had
14  it in for me.
15             Q      Who had it in for you?
16             A      Nathan Brada.
17             Q      And for purposes of discussions going forward,
18  is Nathan Brada the only person in management who you felt had
19  it in for you?
20             A      Yes.
21             Q      And you think Mr. Brada had it in for you why?
22             A      Because that I took off for my mother.
23             Q      And you base the claim that he had it in for
24  you because of the comment he made to you on June 11?
```

Page 154

```
1              A      Yes.
2              Q      And what you understand from Mr. McCoy to be a
3   statement that he made after you came back to work after the
4   April 11 vacation day?
5              A      That's correct.  And also Earl Crone's
6   comment.
7              Q      And remind me, what was Earl Crone's comment?
8              A      Earl Crone told me that Nathan thought that I
9   had taken advantage of him?
10             Q      And did we talk about this earlier?
11             A      Yes.
12             Q      Okay.  It's getting in the day.
13   MR. WALTERS:   I was going to ask him about it too
14  cause I couldn't remember the doctor so you're fine.
15   BY MR. ROBINSON:
16             Q      Okay.  And just very briefly that discussion
17  took place when?
18             A      I don't remember the specific dates but it
19  took place on the beltline.
20             Q      After your April vacation?
21             A      Yes.
22             Q      And Mr. Crone told you that Mr. Brada felt
23  that you had taken advantage of him by taking those vacation
24  days?
```

Page 155

```
1              A      He did.
2              Q      Were other people present when that comment
3   was made?
4              A      No, and Mr. Crone also told me Harold, or
5   excuse me, Nathan thought that I should have called and I
6   tried to call several times and couldn't get a hold of anyone.
7              Q      Nathan felt you should have called when?
8              A      I guess to let them know that I wouldn't be
9   back till Tuesday.
10             Q      Okay.  The information that you are relaying
11  concerning your discussion with Mr. McCoy, you never
12  personally heard Mr. Brada make such a statement?
13             A      As what?
14             Q      That he felt you should -- that he was upset
15  in some way you had taken those vacation days.  You never
16  heard Mr. Brada make that statement?
17             A      No, no, other than just him being rude about
18  it.
19             Q      All right.  And the statement that you
20  attribute to Mr. Crone, you didn't personally hear Mr. Brada
21  make that statement either?
22             A      I did not.
23             Q      And when you say you thought Mr. Brada had it
24  out for you, you understand there are two types of FMLA
```

Page 156

```
1   claims, and I'm sure Rich has explained this to you.  One is
2   called interference and one is called retaliation, and
3   retaliation, they retaliate against you because you exercised
4   your rights under the FMLA.  In this case possibly because you
5   took vacation.  Is that your -- when you say he had it out for
6   you, is that what you mean by the retaliation?
7              A      Yes.
8              Q      Okay.  And other then the statements that Mr.
9   McCoy told you a comment that Mr. Brada had made, Mr. Crone
10  told you a comment that Mr. Brada had made, and the comment
11  that Mr. Brada to you personally on June 11, anything else
12  that you cite as the factual basis for your retaliation claim?
13             A      No.
14             Q      When Mr. Crone told you of Mr. Brada's
15  comments, did you talk to Mr. Pauley or anyone else in human
16  resources about that?
17             A      No.
18             Q      Why not?
19             A      I was just wanting to let it blow over and
20  keep my job.
21             Q      When Mr. McCoy made the comment to you about
22  the statement allegedly made by Mr. Brada during your
23  suspension, did you talk to Mr. Pauley about that?
24             A      I don't remember if I mentioned that to Jack
```

John T. Viars v Greenbrier Minerals, LLC, et al  CA 5:15-cv-15410 on July 25, 2016

Sheet 40   Page 157

1 or not.
2          Q     And I'm going to invite Rich to jump in here
3 and add his two cents as well, out do you understand that in
4 addition to your two FMLA claims, you also assert that you
5 were discharged in violation of the public policy of the state
6 of West Virginia?  You see that claim in your complaint that
7 you have filed?
8          A     Yes.
9          MR. ROBINSON:  Do you contend that the FMLA is the
10 basis of the public policy or is there some other public
11 policy at issue?
12         MR. WALTERS:   FMLA.
13         MR. ROBINSON:  FMLA?
14         MR. WALTERS:   Yes.
15         MR. ROBINSON:  And we're only dealing with the
16 FMLA?
17         MR. WALTERS:   Yes.
18         MR. ROBINSON:  Thank you.  So it's federal law
19 that's providing the basis.  Thank you.  And so the grounds
20 for the public policy wrongful discharge claim would be the
21 same as the FMLA retaliation claim?
22         MR. WALTERS:   Yes.
23 BY MR. ROBINSON:
24         Q     Thank you.  You also assert that Greenbrier

Page 158

1 Minerals' actions toward you constitute intentional infliction
2 of emotional distress.  Are you familiar with that allegation?
3          MR. WALTERS:  Let's go off the record real quick
4 before you get into that, and I'll do this real quick because
5 I know it's 4:30 already.
6                  (WHEREUPON, a discussion was had off
7                   the record, after which the
8                   proceedings continued as follows:)
9          MR. ROBINSON:  All right, off the record, we've had
10 a brief discussion.  I was getting ready to get into questions
11 relating to the intentional infliction of emotional distress
12 and negligent infliction of emotion distress claims that are
13 set forth in the complaint, and it's my understanding that the
14 parties have agreed to stipulate that those claims will be
15 dismissed, and we can enter a stipulation of dismissal with
16 the Court?
17         MR. WALTERS:   That's correct.
18         MR. ROBINSON:  Okay.
19         THE WITNESS:   Stipulations dismissed?
20         MR. WALTERS:   Of just two of the claims.
21         THE WITNESS:   Oh, okay.
22         MR. WALTERS:   Not the lawsuit.
23         MR. ROBINSON:  Do you want to take a break or
24 finish up?

Page 159

1          THE WITNESS:   Let's go.
2 BY MR. ROBINSON:
3          Q     All right.  Returning to your employment since
4 Greenbrier Minerals, with regard to Strata Worldwide, how did
5 you find out about that company and what it does?
6          A     Job service.
7          Q     What job service?
8          A     Logan.
9          Q     And was that part of the Workforce West
10 Virginia state office?
11         A     Yes.
12         Q     And after you went with Strata to be placed
13 with Patriot in 2015, did you continue to work with Strata to
14 get placed elsewhere?
15         A     I did.
16         Q     Who did you work with at Strata, do you
17 remember?
18         A     Tommy Mullins.
19         Q     Tommy Mullins.  What discussions have you had
20 with Mr. Mullins or others at Strata about possible placement
21 at other mines?
22         A     Just if he had anything else and he told me
23 that they didn't.  They had a big meeting with us over here at
24 Charleston where they laid everybody off cause they didn't

Page 160

1 have nowhere to send us.
2          Q     That meeting occurred about when?
3          A     It was after we were laid off.  I can't
4 remember the exact date.
5          Q     Have you continued to stay in touch with Mr.
6 Mullins or others at Stratus since that meeting?
7          A     I don't think he no longer is employed with
8 them.
9          Q     Do you know if the company is still an ongoing
10 concern?
11         A     I do not know.
12         Q     You've had no contact with the company since
13 the meeting?
14         A     No.
15         Q     How about Black Hawk, how did you learn of job
16 opportunities with Black Hawk mining in 2015?
17         A     I applied for a job, and I just about forgot
18 about filling out the application and just one day they
19 called.
20         Q     And how did you know who Black Hawk was and
21 that they might be hiring?
22         A     Well, I didn't know that they were hiring at
23 the time.  I just knew where their office was, and I asked
24 somebody that I know that worked for them, and they told me