Exhibit 1

Deposition of John T. Viars

## Page 1

IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA
BECKLEY DIVISION

JOHN T. VIARS,

        Plaintiff,

v.                  Civil Action No. 5:15-cv-15410
                   Honorable Irene C. Berger

GREENBRIER MINERALS, LLC,
and NATHAN BRADA

        Defendants.

      The deposition of JOHN TOTTEN VIARS was taken pursuant to the Federal Rules of Civil Procedure in the above-entitled action, on the 25th day of July, 2016, commencing at 1:00 p.m. and concluding at 4:45 p.m., at the law offices of Dinsmore & Shohl, LLP, 707 Virginia Street, 13th Floor, Charleston, Kanawha County, West Virginia, before Nancy McNealy, Certified Verbatim Reporter-Master, duly certified by the West Virginia Supreme Court of Appeals and the National Verbatim Reporters Association and Notary Public of West Virginia, pursuant to notice.

## Page 2

APPEARANCES:      ON BEHALF OF THE PLAINTIFF:

                   RICHARD W. WALTERS, Attorney at Law
                   Shaffer & Shaffer, PLLC
                   Post Office Box 3973
                   Charleston, West Virginia 25339-3973

              ON BEHALF OF THE DEFENDANT:

                   WILLIAM E. ROBINSON, Attorney at Law
                   Dinsmore & Shohl LLP
                   Post Office Box 11887
                   Charleston, West Virginia 25339-1887

## Page 3

I N D E X

| Witness: | Examination |
|---|---|
| John Totten Viars | 4 (Robinson) |
| | 176 (Walters) |

| Exhibits: | Marked |
|---|---|
| No. 1, Application for Employment | 52 |
| No. 2, New Employment/Change of Status | 58 |
| No. 3, Position/Pay Changes | 58 |
| No. 4, Complaint | 64 |
| No. 5, Disciplinary Action Form | 66 |
| No. 6, Disciplinary Action Form | 70 |
| No. 7, Disciplinary Action Form | 73 |
| No. 8, Letter dated 12-31-14 | 76 |
| No. 9, Disciplinary Action Form | 86 |
| No. 10, Attendance Chart | 99 |
| No. 11, Work Release Form | 111 |
| No. 12, Disciplinary Action Form | 129 |

Signature Page............................ Page 178
Errata Sheet.............................. Page 179
Reporter's Certificate.................... Pages 180/181

## Page 4

1                (Witness Sworn.)
2  THEREUPON came,
3         J O H N   T.   V I A R S
4  the Plaintiff herein, having been first duly sworn, testified
5  as follows:
6                EXAMINATION
7        BY MR. ROBINSON:
8        Q    Mr. Viars, again my name is Bill Robinson. I
9  represent Greenbrier Minerals in connection with this lawsuit.
10  Have you ever given a deposition before?
11        A    Yes.
12        Q    You have. Okay, so you know basically what
13  we're going to do.
14        A    Yes.
15        Q    You understand you're under oath?
16        A    Yes.
17        Q    I'll be asking question. You'll be answering
18  them truthfully.
19        A    Yes.
20        Q    You've been taught to say yes or no if that's
21  the correct answer, right?
22        A    (Witness nods affirmatively.)
23        Q    It's not a marathon. I think we'll be out of
24  here before 5:00, but if at anytime you want to take a break

## Page 61

 1  Q   So all you remember at this point is Danny and
 2  T. J.?
 3  A   I stand to be corrected, sir. I did work for
 4  Chester for a brief time.
 5  Q   So Chester, Danny and T. J. are the three that
 6  you can remember?
 7  A   Yes.
 8  Q   Did you have a good relationship with all of
 9  them?
10  A   For the most part.
11  Q   Did you feel that all three of those guys
12  treated you fairly?
13  A   No.
14  Q   Who did you feel didn't treat you fairly?
15  A   T. J.
16  Q   Why did you feel T. J. didn't treat you
17  fairly?
18  A   It seemed like the harder I worked, the more
19  he stayed on me.
20  Q   Do you recall approximately what period of
21  time you worked for T. J.?
22  A   The last part of employment.
23  Q   And when you say the harder you worked, the
24  harder he stayed on you, can you give me some examples?

## Page 62

 1  A   I just couldn't do nothing right according to
 2  him. No matter what you did, it was always wrong.
 3  Q   You ever have any arguments with him?
 4  A   No.
 5  Q   You guys didn't raise your voices with each
 6  other, that kind of thing?
 7  A   I didn't.
 8  Q   Okay. Did he raise his voice with you?
 9  A   Yes.
10  Q   That's because he felt you weren't doing a
11  good job?
12  A   I suppose.
13  Q   Was T. J. your section foreman at the time of
14  your discharge?
15  A   Yes.
16  Q   And as of that time in June 2014,
17  approximately how long had you been working with him?
18  A   Not very long at all.
19  Q   A matter of weeks?
20  A   Maybe a month or so.
21  Q   All right. Now Danny and Chester, did you
22  have good relationships with them?
23  A   No problem.
24  Q   You felt they treated you fairly?

## Page 63

 1  A   Yes.
 2  Q   You allege in this case that by terminating
 3  your employment in June of 2015, Greenbrier Minerals
 4  interfered with your rights under the Family and Medical Leave
 5  Act. Are you familiar with that allegation?
 6  A   Yes.
 7  Q   And are you also familiar with the allegation
 8  that by terminating your employment in June 2015, Greenbrier
 9  Minerals retaliated against you for exercising your rights
10  under the FMLA? Do you understand that allegation has been
11  made as well?
12  A   Ask the question again, please.
13  Q   Do you understand that you assert in this case
14  that by discharging you in June 2015, Greenbrier Minerals
15  retaliated against you for exercising your rights under the
16  FMLA?
17  A   I was never offered FMLA.
18  Q   Do you understand you're alleging retaliation
19  for using FMLA?
20  A   I never used FMLA.
21  Q   You're not aware of a retaliation allegation
22  in this case; is that fair?
23  A   Yes.
24        (WHEREUPON, the Complaint was marked

## Page 64

 1  as Deposition Exhibit No. 4 for
 2  identification and a copy attached
 3  hereto and made a part hereof.)
 4  BY MR. ROBINSON:
 5  Q   Let me ask you, Mr. Viars, to please turn to
 6  page 2 of what we've marked as Deposition Exhibit 5, but
 7  before we go there.
 8       MR. WALTERS:   It's 4.
 9  BY MR. ROBINSON:
10  Q   Thanks. I correct that to Exhibit 4. Do you
11  recognize the document we've marked as Exhibit 4?
12  A   Yes.
13  Q   It's a copy of the complaint that you filed in
14  this lawsuit; is that right?
15  A   Yes.
16  Q   Did you read this before it was filed?
17  A   Yes.
18  Q   Let me ask you to turn please to paragraph 8
19  on page 2 of this exhibit?
20  A   (Witness complies.)
21  Q   Paragraph 8 rather alleges, "On or about April
22  27, 2015, plaintiff's mother underwent open-heart surgery.
23  Following her surgery, plaintiff took a one week's vacation to
24  provide support and care for his mother." You're familiar

1  with that allegation?
2       A    Yes.
3       Q    Do you believe that to be correct?
4       A    Yes.
5       Q    All right. Then paragraph 9 reads, "On or
6  about June 1, 2015, plaintiff's mother's condition worsened
7  and she was moved from a nursing home to the hospital.
8  Plaintiff Viars is the medical power of attorney for his
9  mother and as such took the day off to care for his mother."
10 Are you familiar with that allegation?
11      A    Yes.
12      Q    And do you believe that to be accurate?
13      A    Yes.
14      Q    Am I correct that the only FMLA leave time at
15 issue in this case took place in April 2015 when you took five
16 days of vacation time for your mother's surgery and a single
17 day in June 2015 when your mother was moved to the hospital?
18      A    Yes.
19      Q    You did not take off any other FMLA covered
20 time before your discharge in June 2015?
21      A    No.
22      Q    Do you recall that right within a month or so
23 after you transferred to Lower War Eagle you were written up
24 for causing equipment damage?

Page 66

1       A    Excuse me.
2       Q    Do you remember that shortly after being
3  transferred to the Lower War Eagle Mine you were written up
4  for causing equipment damage.
5       A    Shortly after?
6       Q    Yes, sir.
7       A    No, sir. I don't know what time frame we're
8  talking here.
9       Q    We talked about a moment ago about you were
10 transferred to Lower War Eagle Mine effective August 5, 2012,
11 correct?
12      A    Yes.
13                  (WHEREUPON, the Disciplinary Form
14                  was marked as Deposition Exhibit No.
15                  5 for identification and a copy of
16                  which is attached hereto and made a
17                  part hereof.)
18 BY MR. ROBINSON:
19      Q    All right. Then let me ask you to look at
20 what we've marked as Deposition Exhibit No. 5, which is dated
21 August 31, 2012. Have you seen this document before?
22      A    No, sir.
23      Q    This is a document that appears to have been
24 prepared by Danny Osborne, and I apologize for the quality of

Page 67

1  the copy but the first language at the top says, "What was the
2  cause of the failure," and he circles item C, "Equipment
3  damage." Do you recall an incident on or about August 31,
4  2012, relating to an instance of equipment damage?
5       A    I don't remember.
6       Q    If you look down at item number 6, it asks the
7  question, "What can be done to prevent this from happening
8  again," and Mr. Osborne answers "That the shuttle car operator
9  needs to pay more attention to and where the tight spots are
10 and to take more time to properly put cable out of his
11 roadway." Do you recall if Mr. Osborne talked to you about
12 that in August 2012?
13      A    I don't remember it.
14      Q    Do you remember this incident at all?
15      A    Not when my canopy caught a cable, no.
16      Q    And it says in item 7, "Give a description of
17 what happened to cause cable damage," and Mr. Osborne wrote,
18 "Shuttle car was coming back to the dump when his canopy
19 caught cable against rib." Does that help you remember at
20 all?
21      A    I can't recall this.
22      Q    Okay. Mr. Osborne then writes, "I talked to
23 the shuttle car operator, told him to be more aware of where
24 and how the miner cable is running and hanging, take more time

Page 68

1  to ensure it's out of his roadway." Do you recall him talking
2  to you about that?
3       A    Now that it mentions the miner cable, I recall
4  the incident.
5       Q    Okay. And do you recall that in this incident
6  on or about August 31, 2012, the cable was damaged when you
7  ran over it?
8       A    Didn't run over it, sir. It was on the rib
9  when my canopy caught it. I do remember what he's talking
10 about. I thought he was referring to the shuttle car cable
11 itself.
12      Q    What is your understanding or memory of what
13 occurred that day?
14      A    My understanding is you could only get it up
15 so high, and it was a real tight place. The canopy stuck out
16 and when I turned the corner, I had been turning it all day
17 and staying off of it, but the one time got in there and got a
18 little close to the rib and my canopy cut it and cut the miner
19 cable.
20      Q    Okay. So this incident was written up on
21 August 31, 2012, did in fact occur?
22      A    Yes, it did, but I've never seen this paper
23 before in my life.
24      Q    Do you recall Mr. Osborne talking to you about

1  call back and ask for an additional day; does that sound
2  familiar?
3         A    Yes, and that also sounds terribly wrong.
4         Q    It sounds correct but wrong?
5         A    It's wrong.
6         Q    Is that correct?
7         A    No.
8         Q    Okay, all right. What do you recall
9  happening?
10        A    Exactly what I just told you. My very words
11 to Nathan was I said I had 40 hours, right? He said yes, 40
12 hours. I said okay. I said, hopefully, I don't need all of
13 them, but I'll be back as quick as she's taken care of.
14        Q    Do you remember calling Earl Crone at home and
15 asking for an additional day of vacation?
16        A    No, I do not. I remember possibly trying but
17 it wasn't to ask for an additional day. I may have tried to
18 call Harold to let him know what was going on because I felt
19 that they should be informed.
20        Q    Do you remember actually talking to Mr. Crone
21 about being off on Monday, April 27, the day of your mom's
22 surgery?
23        A    No, I do not.
24        Q    And as you can see from the attendance chart,

Page 106

1  sir, Exhibit No. 10, the vacation days you took in April were,
2  in fact, counted by Greenbrier Minerals as vacation days, were
3  they not?
4         A    Yes, they are.
5         Q    They were not counted as unexcused absences?
6         A    That's correct.
7         Q    You were paid for those days?
8         A    I was.
9         Q    And, in fact, according to this chart, you had
10 no unexcused absences at all in 2015; is that correct?
11        A    That's correct.
12        Q    And because they were counted as vacation
13 days, as you had requested, they were not counted as
14 chargeable absences or occurrences under the attendance
15 policy; is that right?
16        A    Say that one more time.
17        Q    Did you understand that under the company's
18 attendance policy, unexcused absences, for example, were
19 counted as chargeable absences or occurrences --
20        A    Yes.
21        Q    -- that would count against you?
22        A    Yes.
23        Q    And did you understand that these five days in
24 April were not counted as chargeable days because they were

Page 107

1  vacation days?
2         A    I did.
3         Q    At what hospital was your mom's surgery
4  performed?
5         A    CAMC.
6         Q    Memorial Division up in Kanawha City?
7         A    Yes.
8         Q    Your interrogatory answers list Dr. Kenneth
9  Sales as among your mom's treating physicians. Did she him
10 for her heart condition?
11        A    I'm thinking she didn't see Dr. Sales until
12 after she had the surgery.
13        Q    Dr. Sales is a family physician?
14        A    Yeah, I'm pretty sure.
15        Q    Was she your mom's treating family doctor?
16        A    Yes.
17        Q    And I assume at some point Dr. Sales or
18 someone else referred your mom then to a cardiologist?
19        A    Well, she didn't have Dr. Sales until after
20 she'd had the open heart surgery. She was at Logan. Now I
21 think this is the physician's name, Dr. Malik from Logan, done
22 a cath on her and found the blockages and he sent her directly
23 to CAMC.
24        Q    And for the court reporter can you spell Dr.

Page 108

1  Malik's name?
2         A    It probably wouldn't be right.
3         Q    Close approximation.
4         A    M-a-u-i.
5         Q    Okay, well, like the island?
6         A    Right.
7         Q    All right. Once your mom was referred to
8  CAMC, did she get a cardiologist here in Charleston?
9         A    She did.
10        Q    Who was her cardiologist here in Charleston?
11        A    I can't remember his name.
12        Q    And is it that cardiologists who also
13 performed her surgery at CAMC?
14        A    Yes.
15        Q    And then following her surgery she began
16 seeing Dr. Sales?
17        A    Yes.
18        Q    Do you recall what time of day your mother's
19 surgery occurred?
20        A    It started early in the morning.
21        Q    And, unfortunately, I know from personal
22 experience with these bypasses, it's safe to assume your mom
23 was unconscious most or all of the day?
24        A    Yes.

1  the third shift dispatcher. I can't remember which one of
2  them boys I talked to.
3      Q   Do you recall the name of the third shift
4  dispatcher?
5      A   Face right in my head, but I can't remember
6  his name.
7      Q   Approximately what time did you call in?
8      A   It was way in the morning hours. I can't
9  remember exact time.
10     Q   Okay. And I think in a question a minute ago
11 I said 3 or 4 p.m. You arrived there 3 or 4 a.m. on June 10?
12     A   It was a.m. hours.
13     Q   And you reported to Mr. Grimmett or the other
14 dispatcher what information?
15     A   Told her what had happened, that they had to
16 take my mother to the hospital from the nursing home and was
17 told to me that she was in pretty bad shape and I was needed
18 to go and to go be with her so I went.
19     Q   And what response did you receive to that?
20     A   He said I'll tell him when they come. He was
21 talking about management.
22     Q   Okay. Anything else you recall?
23     A   No.
24     Q   That was the full extent of the conversation?

Page 118

1      A   That was the full extent.
2      Q   Did you talk to anyone else from work on June
3  10?
4      A   Not that I recall.
5      Q   Did you return to work on June 11?
6      A   I did.
7      Q   You were not required to miss work to provide
8  care to your mother on that day?
9      A   I probably could've been there but I had to
10 make a living.
11     Q   And you came to work on June 12?
12     A   I did.
13     Q   June 12 was the day you were suspended.
14     A   Yes.
15     Q   Now when you returned to work on June 11, did
16 you give the work release form, Exhibit 11, to anyone?
17     A   I did.
18     Q   Who did you give it to?
19     A   Nathan Brada.
20     Q   And do you recall where that discussion took
21 place?
22     A   Outside of the mine office and actually I
23 ended up having to give it to Jamie New because Nathan
24 wouldn't take it.

Page 119

1      Q   What were the hours of your shift normally as
2  of June 10, 2015, June 11?
3      A   7:00 to 4:00.
4      Q   7 a.m. or p.m.?
5      A   7 a.m.
6      Q   And so when you came to work on June 11 with
7  the work release form in hand, did you see Mr. Brad at about 7
8  a.m. or shortly before 7 a.m.?
9      A   Before 7 a.m.
10     Q   And Mr. Brada was where when you saw him?
11     A   He was getting on a ride outside of the mine
12 office where they keep the rides to charging and he was
13 heading into the mines.
14     Q   And was Mr. New with him?
15     A   He was.
16     Q   And Mr. New's position was what at the time?
17     A   Mine foreman.
18     Q   Were there others present as well?
19     A   Not that I remember.
20     Q   So did you stop them when you saw them as they
21 were getting ready to enter the mine?
22     A   I did. I approached Nathan.
23     Q   All right. And tell me -- take it from there.
24 Tell me what you said and what he said in response?

Page 120

1      A   I come to Nathan and I said, "Nathan, here's
2  the excuse to where was at tomorrow with my mom," and he said,
3  "I ain't got time for all your blanking lies. Give that S'
4  to Jamie." That's exactly what he said.
5      Q   And you responded how?
6      A   I handed it to Jamie. I said nothing.
7      Q   And did he elaborate on what he meant by your
8  lies?
9      A   He did not.
10     Q   Anything else you recall Mr. Brada saying
11 during that conversation?
12     A   No.
13     Q   That was it?
14     A   That was it.
15     Q   That one statement?
16     A   That one statement.
17     Q   How about Mr. New, did he say anything during
18 the conversation?
19     A   I handed him the excuse. He said okay, best
20 to what I can remember.
21     Q   Was that the extent of that entire interaction
22 between you, Mr. New and Mr. Brada prior to 7 a.m. on June 11?
23     A   You're saying prior to 7 a.m., well, when I
24 come back from my vacation, Nathan cussed me as well.

```
 1        Q    Okay, we'll get into that in a minute. Let's
 2  stick with June 11 for a minute.
 3        A    You said prior to 7 a.m., that would be very
 4  much prior.
 5        Q    It would be very much prior. We'll go back.
 6        A    Okay.
 7        Q    On June 11 was that the extent of any
 8  interaction you had with Mr. Brada and Mr. New with regard to
 9  your work release form?
10        A    Yes.
11        Q    Okay. Did you talk to Mr. Brada or Mr. New at
12  any other time that day, June 11?
13        A    I don't recall talking to them, no. I may
14  have, maybe just something about work or maybe said something
15  to him, but as far as about that matter, no.
16        Q    Nothing with regard to either the form or you
17  being absent from work on June 10?
18        A    No.
19        Q    All right. Let's go back and fill in the gap.
20  When you returned from vacation, you're referring to vacation
21  in April of 2015?
22        A    Yes.
23        Q    And you said Mr. Brada made a comment to you
24  when you returned from vacation.
```

Page 122

```
 1        A    Yes. I didn't see Mr. Brada until the end of
 2  the shift. I was -- that's on my way home, and I went in
 3  after I came outside to fill out my fire boss book or no, no,
 4  I'm wrong. I was on the section by then, or no, I stand to be
 5  corrected again. They had somebody -
 6        Q    Go ahead and think it out. We're not in a
 7  race here.
 8        A    They pulled me off that day to work belts
 9  cause somebody was absent, okay, and I remember clearly now,
10  and I was going in to fill out the fire boss book, and Nathan
11  was on his way out of that office and he looked and saw me,
12  and he said, "Well, John T., we're glad you can f'ing' join
13  us finally," and I just let that go.
14        Q    Do you recall what date that comment might
15  have been made on?
16        A    It was the day I came back from vacation.
17        Q    April 28th?
18        A    Whatever the day I come back was. I believe
19  that was the day.
20        Q    I'm glad you can "f'ing" join us?
21        A    Yes.
22        Q    Who else was present when that comment was
23  made?
24        A    There were people in the office. I do
```

Page 123

```
 1  remember that T. J. Warden was one of them, and there were
 2  other folks, but I can't exactly remember who all was in
 3  there. I'd be afraid to make an assumption on that.
 4        Q    Okay. How did you respond to Mr. Brada's
 5  comment?
 6        A    And I said -- I didn't say a word.
 7        Q    All right. From the time you first requested
 8  vacation in April 2015 until you were suspended on June 12,
 9  did Mr. Brada make any comments to you other that than the two
10  you've told us about already?
11        A    No.
12        Q    When Mr. Brada made the comment after you
13  returned from vacation in April, did Mr. Warden say anything?
14        A    No.
15        Q    Did anyone else say anything?
16        A    No.
17        Q    So it was, essentially, Mr. Brada making his
18  comment and you walking away?
19        A    Yes.
20        Q    In any event you were given the day off as you
21  requested on June 10 to be with your mother at the hospital?
22        A    I didn't know at the time that it was excused,
23  no. He didn't say anything to me.
24        Q    Well, when you came back to work and gave them
```

Page 124

```
 1  the work release form on June 11, how did you think the
 2  absence would be treated?
 3        A    I believed it would be unexcused.
 4        Q    You thought it would be unexcused?
 5        A    Yes.
 6        Q    Why did you think it would be unexcused?
 7        A    Because I've seen them on many, many
 8  occasions, didn't matter if you had an excuse or not. If you
 9  didn't have a date to back the absence up, it was unexcused
10  and you received an occurrence for it.
11        Q    Let me ask you look please back to Exhibit 10,
12  the attendance chart.
13        A    (Witness complies.)
14        Q    You'll see that for both 2013 and 2015, there
15  are no unexcused days counted against you those years. Do you
16  see that?
17        A    20 what now?
18        Q    2013 and 2015 you had no unexcused days
19  according to this chart, right?
20        A    No.
21        Q    There are three unexcused absences listed in
22  2012. To your knowledge, were any of those unexcused absences
23  situations such that you just described where you provided
24  work release forms or medical excuses, and they still counted
```

1   A   Solid block.
2   Q   And he came to you and made the request to
3 you, as I understand it, sometime that morning; is that fair?
4   A   No.
5   Q   What do you recall about when the request was
6 made that you construct this brattice?
7   A   Well, I knew that the supplies were over there
8 around noonish, but he had me doing other things, and then he
9 said, hey, you got to go build that brattice and by the time I
10 got over there to build it, it was probably between, just a
11 rough estimate, one, two o'clock in the day.
12   Q   All right.  So the supplies to build the
13 brattice on June 11 were delivered to your area around noon
14 that day?
15   A   That's correct.
16   Q   But as I understand what you're saying,
17 because you were doing other things, you didn't actually start
18 building it until sometime between 1:00 and 2:00?
19   A   That's right.
20   Q   And around three o'clock that afternoon, did
21 Mr. Warden return to the area to check on your progress in
22 building the brattice?
23   A   He did.
24   Q   And the brattice was not complete?

Page 134

1   A   That's correct.
2   Q   Fair to say that Mr. Warden was displeased
3 that the brattice hadn't been completed?
4   A   He didn't tell me he was.
5   Q   Did he tell you that three hours from the time
6 those materials were delivered should have been plenty of time
7 for you to build it?
8   A   He did not.
9   Q   Did he direct you to remain in the area and
10 continue into the next shift until you completed the brattice?
11   A   He did.
12   Q   And did you, in fact, complete it?
13   A   I did.
14   Q   Do you recall approximately what time?
15   A   Approximately, the time that the brattice was
16 finished was probably about four o'clock, between four and
17 five, I'll say that.
18   Q   I guess we're talking about the end of your
19 shift.  We should be more specific.  Your shift was scheduled
20 to end at 3:00?
21   A   No, sir, 4:00.  We left the section probably
22 between 3:15 and 3:30 every day.
23   Q   All right.  So how long - in your view how
24 long did you have to stay over into the next shift to complete

Page 135

1 the brattice?
2   A   Well, I completed it, like I said, between
3 4:00 and 5:00, but I didn't get outside till nine o'clock.
4   Q   You didn't have a ride?
5   A   That's right.
6   Q   When you completed the brattice between four
7 and five o'clock, was Mr. Warden still at the mine?
8   A   I wouldn't know.  I was inside and he was
9 outside.
10   Q   Did you know that Mr. Warden was unhappy with
11 the situation?
12   A   He didn't say he was.
13   Q   Did you detect that he was?
14   A   I be guessing again, wouldn't I?
15   Q   Well, I'm not asking you to guess.  Based on
16 your observations, did you observe that he was upset or you
17 didn't know?
18   A   He didn't appear to be.
19   Q   All right.  But you're catching on.  Good
20 catch.  Do you remember if there had been another incident
21 earlier that week with your construction of another brattice?
22   A   Yes.
23   Q   Tell me about that.
24   A   Okay, I know the one you're talking about.  I

Page 136

1 built a stopping and the bottom was busted up real bad, and it
2 was very difficult to get the block to set in there straight
3 and to be level, and I done the best that I could with it.  He
4 come over there and he starts cussing about it.  The cuss
5 words he said, Lord, he said so many, I couldn't tell you what
6 he said.
7   Q   He being Mr. Warden?
8   A   Yes.  Anyway I told him, I said, "Yeah, it's
9 leaning.  I know it's leaning, T. J." I said, "I'm starting
10 from one end and taking it to the top all the way across so it
11 don't fall," and I said, "I believe it will be okay," and he
12 said, "Man, that would hurt somebody," and I said, "Well, if I
13 get through the top and get it plastered, I think it will be
14 okay," and at that point he went away.  Nothing else was ever
15 said.
16   Q   Did he tell you he felt during this discussion
17 where he said he was afraid it would tip, was it clear that he
18 thought there was a safety issue, this might fall on somebody?
19   A   Yes.
20   Q   Did you rebuild that brattice or did you
21 continue to construct it?
22   A   Continued to construct it.
23   Q   And was it completed?
24   A   It was.